NORTH CAROLINA

MITCHELL COUNTY

G.P. SULLINS LAND COMPANY, LLC, )
)
Plaintiff, )
)
v. )
)
GPS QUARTZ CORP., FRANK )
SALVATI, AND BLAIR KRUEGER, )
)
Defendants. )
)

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
23 CVS _____

MITCHELL CO., C.S.C.

BY_____

**COMPLAINT**

Plaintiff G.P. Sullans Land Company, LLC ("Sullins, LLC") submits this complaint for a declaration that it has no relationship, contractual legal or otherwise with Defendants GPS Quartz Corp., Frank Salvati, or Blair Krueger. In support of this Complaint, Sullins, LLC shows the Court the following:

## PARTIES AND JURISDICTION

1.    Sullins LLC is a limited liability company organized and existing under the laws of the State of North Carolina with a principal place of business in Mitchell County, North Carolina.

2.    Upon information and belief, GPS Quarz Corporation is a Delaware Corporation with officers in Canada.

3.    Upon information and belief, Frank Salvati is a citizen and resident of Canada.

4.    Upon information and belief, Blair Krueger is a citizen and resident of Canada.

5.    The court has jurisdiction over the subject matter and parties in this action. This dispute centers on the real property that Sullins LLC owns in Mitchell County that can be used for a quartz sand mining operation.

6.    Venue is proper pursuant to N.C. Gen. Stat. § 1-82.

## FACTS

7. Beginning in the 1890s, Guilford Perry Sullins ("GP Sullins") acquired numerous tracts of land in Mitchell County.

8. At one point, GP Sullins owned hundreds of acres (the "Mountain Land").

9. In 1990, GP Sullins's heirs obtained a boundary line survey of the remaining Mountain Land (the "Keen Boundary Line Survey"). As set forth in the Keen Boundary Line Survey, as of 1990, the heirs of GP Sullins continued to own three tracts: a 32.94 acre tract with access to a public road (the "Access Tract", shown as Tract 2 in the Keen Boundary Line Survey); a 25.21 acre tract (the "Middle Tract", shown as Tract 3 in the Keen Boundary Line Survey which was subsequently deeded to a predecessor in interest to The Quartz Corporation); and a 184.77 acre tract (the "Large Tract", and collectively with the Access Tract the "Mining Property").

10. In the 2000s, GP Sullins's heirs began consolidating their undivided interests in real estate in Sullins LLC. Sullins LLC, therefore, now has an undivided interest in the Mining Property.

11. There are very few places in the United States that produce high quality quartz sands. Among other things, quality quartz sands are useful needed in the manufacture of silicon wafers for computers.

12. Sullins LLC is informed and believes that the Mining Property contains high grade quartz sand whereby the deposits exceed 99% pure silica. Indeed, the mines owned and operated by Sibelco and The Quartz Corporation neighboring the Mining Property produce high quality quartz sand.

2

13.    Because of the likelihood that the deposits on the Mining Property are high quality quartz sands, the Mining Property is worth substantial money. Upon information and belief, the Mining Property may be worth in excess of $100 million.

14.    Sometime in the 2020s, various Sullins family members began discussions with Mr. Salvati and Mr. Krueger concerning the development of the Mining Property. Mr. Salvati and Mr. Krueger had many calls into North Carolina as part of these discussions.

15.    In July 2022, Mr. Salvati and Mr. Krueger sent Sullins, LLC a proposed Letter of Intent to conduct a business transaction with Sullins LLC. A true and correct copy of the Letter of Intent is attached hereto as Exhibit A.

16.    Under the Letter of Intent, Mr. Salvati and Mr. Krueger would create a new Delaware company ("NewCo"). Sullins LLC would then contribute the Property to NewCo. In exchange for their Mining Property worth Millions of Dollars, Sullins LLC would obtain a 40% equity stake in NewCo and obtain the right to elect three of NewCo's seven Board Members.

17.    On the other hand, Mr. Salvati and Mr. Krueger were not putting any equity into NewCo pursuant to the Letter of Intent. Despite the lack of any real contribution to the business, Mr. Salvati and Mr. Krueger proposed that they should receive a 40% of the equity stake in NewCo.

18.    Because the deal as written in the Letter of Intent is patently unreasonable, Sullins LLC rejected the same. In September 2022, Sullins LLC, through counsel, countered with a reasonable term sheet. All discussions on a letter of intent broke-down thereafter. No party signed any version of the Letter of Intent.

3

19.     While discussions as to a larger transaction were ongoing, Sullins, LLC remained interested in working with Mr. Salvati and Mr. Krueger. Specifically, Sullins, LLC needed assistance regarding drilling services.

20.     To that end, the parties began negotiating a management services agreement.

21.     Before entering into the management services agreement, the parties attempted to negotiate a non-disclosure agreement.

22.     Sullins, LLC began those negotiations by sending a relatively form non-disclosure agreement.

23.     Mr. Salvati and Mr. Krueger countered with a very onerous version that, among other things, purported Sullins, LLC from soliciting any further investors or purchasers for the Mining Property.

24.     To that end, in December 2022, Mr. Salvati sent Sullins, LLC's counsel a signed version of a non-disclosure agreement. Sullins, LLC made abundantly clear that it did not agree with the version Mr. Salvati sent, and that Mr. Salvati needed to sign Sullins, LLC's version.

25.     While the parties never agreed to the non-disclosure agreement (or the Letter of Intent) they also discussed the Consulting Services Agreement. The last version of the Consulting Services Agreement exchanged between the parties is attached hereto as Exhibit B.

26.     Mr. Salvati and Mr. Krueger rejected the version of the Consulting Services Agreement attached hereto as Exhibit B. The parties never signed any version of the Consulting Services Agreement.

27.     That said, Mr. Salvati and Mr. Krueger did provide consulting services for Sullins LLC with respect to an extraction program on the Mining Property. In exchange for those services, Sullins, LLC paid Mr. Salvati and Mr. Krueger $20,000 per month for approximately six months.

4

28.     Neither Mr. Salvati nor Mr. Krueger provided <u>any services after April 2023</u>. Despite the fact that they provided no services after April 2023, Mr. Salvati and Mr. Krueger continued to send invoices to Sullins LLC.

29.     On or about July 6, 2023, Sullins LLC sent a letter refuting the invoices, pointing out that the only agreement between the parties was a verbal agreement to pay $20,000 per month on a month-to-month basis for consolation services relative to the extraction program, and that there were no other agreements between the parties. A copy of that letter is attached hereto as Exhibit C.

30.     During the pendency of the negotiations between the parties Mr. Salvati and Mr. Krueger incorporated GPS Quartz Corp. as a Delaware Corporation. Upon information and belief, Mr. Salvati and Mr. Krueger intended for GPS Quartz Corp. to own the Mining Property following a completed deal with Sullins LLC. Of course, that deal never materialized and there was never any agreement for Sullins LLC to contribute anything to GPS Quartz Corp.

31.     On August 11, 2023, GPS Quartz Corp. ("GPS") sent a response stating that GPS has a "clear and unequivocal agreement" to "acquire 100% of the shares of [Sullins, LLC] and take ownership of the assets" in exchange for the issue of 40% of the common shares of GPS.

32.     A true and correct copy of the response letter is attached hereto as Exhibit D.

33.     The letter concludes by stating "We are hereby providing notice of GPS' ownership in [Sullins, LLC] and its assets . . . . We require immediate written confirmation from [Sullins, LLC], that it will not take any steps to dispose of its assets, encumber, impair or otherwise alienate the assets, and will not do so until such time as the shares are transferred from [Sullins, LLC] to GPS in accordance with the terms of the Agreement. We ask for a response by August 16, 2023."

34.     The letter further accuses Sullins, LLC of misappropriating GPS's intellectual property.

35.     Sullins, LLC now files this Complaint seeking a declaration that it has no relationship, contractual or otherwise, with any of the Defendants.

### FIRST CAUSE OF ACTION
(Declaratory Judgment)

36.     Sullins, LLC incorporates all allegations set forth above as if fully set forth herein.

37.     A real, justiciable controversy exists between Sullins, LLC and the Defendants regarding (a) whether there is any contract between Sullins, LLC and the Defendants; (b) whether Defendants have an ownership interests in Sullins, LLC; (c) whether Sullins, LLC is required to transfer its membership interests to Defendants; (d) whether Sullins, LLC is required to transfer any portion of the Mining Property to Defendants; (e) whether there is a partnership, joint venture, or other fiduciary relationship between the parties; and (f) whether Sullins, LLC has misappropriated any of the Defendants' intellectual property; and (g) whether Sullins, LLC has any obligations whatsoever to Defendants.

38.     There was never a meeting of the minds between the parties as to anything. The parties could not even agree to the form of a non-disclosure agreement.

39.     Sullins, LLC has paid for all consulting services pursuant to the verbal, month-to-month agreement between the parties. That verbal agreement has been terminated.

40.     Sullins, LLC is entitled to a judgment declaring the following: (a) other than the verbal, month-to-month agreement for consulting services, there are no contracts or agreements among Sullins, LLC and the Defendants; (b) the verbal, month-to-month agreement has been terminated; (c) Defendants have no ownership interests in Sullins, LLC; (d) Sullins, LLC is not required to transfer any portion of its ownership interests or any portion of the Mining Property to

6

Defendants; (e) there is no partnership, joint venture, or other fiduciary relationship between the parties; (f) Sullins, LLC is not misappropriating any of Defendants' intellectual property; and (g) Sullins, LLC owes Defendants nothing and has no obligations to Defendants, legally or equitably.

Wherefore, Sullins, LLC respectfully requests that the Court issue a judgment:

1. Declaring the following: (a) other than the verbal, month-to-month agreement for consulting services, there are no contracts or agreements among Sullins, LLC and the Defendants; (b) the verbal, month-to-month agreement has been terminated; (c) Defendants have no ownership interests in Sullins, LLC; (d) Sullins, LLC is not required to transfer any portion of its ownership interests or any portion of the Mining Property to Defendants; (e) there is no partnership, joint venture, or other fiduciary relationship between the parties; (f) Sullins, LLC is not misappropriating any of Defendants' intellectual property; and (g) Sullins, LLC owes Defendants nothing and has no obligations to Defendants, legally or equitably.

2. Taxing the costs of this action against Defendants;

3. Ordering such other and further relief as the Court deems just and proper.


This the 16th day of August 2023.


Clint S. Morse (NC Bar No. 38384)

*Attorneys for Plaintiff*

OF COUNSEL:
BROOKS, PIERCE, MCLENDON,
 HUMPHREY & LEONARD, LLP
PO Box 26000

7

Greensboro, NC 27420
Telephone: (336) 271-3167
Fax: (336) 232-9167

8

# Exhibit A

# GPS COMPANY

(a C corporation to be incorporated in Delaware, USA)
360 Bay Street, 9th Floor [#999]
Toronto, ON, Canada M5H 2V6

July xx, 2022

G.P. Sullins Land Company, LLC
1820 Spencer Mountain Road
Gastonia, N.C., USA 20854

PRIVATE & CONFIDENTIAL

**Attention:** Mr. John Keith Taylor, President & Manager

Dear Mr. Taylor, Keith:

**Re:** Business Transaction with G.P. Sullins Land Company, LLC ("SULL")

This Letter of Intent (**"LOI"**) describes the basis upon which GPS COMPANY (**"GPS-C"**) and G.P. Sullins Land Company, LLC (**"SULL"**) are prepared to complete a business transaction by way of an amalgamation, arrangement, takeover bid, share purchase or other form of transaction (the **"Proposed Transaction"**).

This LOI sets out certain non-binding understandings in ARTICLE 1 (the **"Non-Binding Provisions"**) and certain binding agreements in ARTICLE 2 and ARTICLE 3 (the **"Binding Provisions"**). The Binding Provisions include provisions which are intended to survive the termination of this LOI and provisions which are not. Details of the companies' respective share distribution and structure can be found on **"Schedule A"**.

## ARTICLE 1
## NON-BINDING PROVISIONS

**Section 1.1 Non-Binding Provisions.**

The provisions set out in this ARTICLE 1 are intended only to outline the principal terms and conditions upon which the parties wish to commence negotiating the Proposed Transaction and the parties do not intend, and the provisions of this ARTICLE 1 do not create or constitute, any legally binding obligations between the parties, nor impose any liability on any party to another.

**Section 1.2 Definitive Agreement.**

The precise terms of any agreements between the parties relating to the Proposed Transaction will be contained in a definitive written agreement to be negotiated among, and satisfactory to, the parties and their respective counsel (the **"Definitive Agreement"**), which will address matters that have not yet been discussed in addition to the matters set out herein. The parties hereto acknowledge and agree that if, in connection with finalizing the Definitive Agreement, a particular legal structure is determined by one or both parties hereto to be beneficial or advisable for the purpose of addressing any liability, corporate (including any Right-Of-First-Refusal "R.O.F.R") or tax concerns of the parties, the parties shall, at such time, consider in good faith available alternatives that would best address such issues. The parties intend that the Proposed Transaction will be 'structured' as necessary to minimize any tax consequences to GPS-C and to SULL (and their respective shareholders) and so that the Proposed Transaction may be completed in compliance with all applicable securities laws. The Definitive Agreement will contemplate a closing date sometime after the date on which the Definitive Agreement is executed and after the conditions in the Definitive Agreement have been satisfied. GPS-C and its counsel will be responsible for preparing the initial draft of the Definitive Agreement. It is currently contemplated

that a draft will be circulated by August 31, 2022, with the intent to finalize by October 31, 2022. The following represents the parties present intentions and the basis of their understanding with respect to the Definitive Agreement is to be drafted:

(a)  SULL Share Capital. Refer to **"Schedule A"** for details of SULL's outstanding share structure.

(b)  GPS-C Share Capital. It is understood that the share capital of GPS-C will consist of 8,000,000 common shares (the **"GPS-C Shares"**) as of the date hereof. Refer to **"Schedule A"** for details of GPS-C's outstanding share structure.

(c)  Advance of Funds. Deleted.

(d)  Share Consolidation. Prior to the completion of the Proposed Transaction, subject to applicable shareholder and/or regulatory approvals, GPS-C may complete a consolidation (or reverse consolidation) of its common shares (as may be agreed with SULL).

(e)  Securities Exchange. At the closing of the Proposed Transaction, the holders of the then issued and outstanding common shares of SULL **("SULL Shares")** will exchange such shares in consideration for post-consolidation GPS-C Shares on a 1 SULL Share for 1 post-consolidation GPS-C share basis (or on such other basis as may be agreed with SULL), the parties' intent being that the Exchange Ratio shall reflect an approximate total property value of **US$40 Million.**

(f)  Options and Warrants. Deleted.

(g)  GPS-C Shareholders Meeting. Prior to the completion of the Proposed Transaction, GPS-C shall call a meeting of its shareholders for the purpose of approving, among other matters (i) election of Board Nominees (as defined below) to the board of directors of GPS-C – the election of SULL nominees to the GPS-C board will be effective on completion of the Proposed Transaction; (ii) a share consolidation or reverse consolidation (the **"Consolidation"**) (if required or desired by SULL); (iii) a name change suitable to its acquisition of SULL (the **"Name Change"**) (if required or desired by SULL); (iv) if required by applicable laws or otherwise desired by GPS-C or SULL, the approval of the Proposed Transaction; and (v) such other matters as GPS-C and SULL jointly consider necessary or appropriate.

(h)  SULL Shareholders Meeting. Prior to the Completion of the Proposed Transaction, SULL shall, if required by applicable law or otherwise desired by SULL, call a meeting of its shareholders for the purpose of approving, among other matters (i) a share split or consolidation of the SULL Shares as necessary or appropriate to satisfy the intended Exchange Ratio and (ii) the approval of the Proposed Transaction.

(i)  Board Nominees. It is the parties' intention that upon closing of the Proposed Transaction, the board of GPS-C may be reconstituted, if necessary and/or desired, in a manner that complies with the requirements of applicable laws and will be comprised of 3 of 7 members nominated by SULL (the **"Board Nominees"**), subject to the receipt of any, and all, applicable regulatory approvals.

(j)  Fees. The Parties acknowledge that, upon closing of the Proposed Transaction, GPS-C may be required to pay finder's fees and or M&A consulting fees, such fees to be payable consistent with applicable law.

(k)  Concurrent Financing. Prior to and/or concurrent with the completion of the Proposed Transaction, GPS-C may complete one or more private placements (the **"GPS-C Private Placement"**) of GPS-C Shares or convertible notes (the **"Offered Securities"**) in consultation with SULL, for gross proceeds of up to **US$2,000,000.** Subject to agreement with third parties engaged to sell the units, the parties anticipate that the units will include GPS-C shares or notes convertible into GPS-C Shares at a price of US$1.00 per GPS-C Share.

(l)  N/A.

(m)  Voting Support. If requested to do so, the principal shareholders of GPS-C and SULL agree to enter into customary voting support agreements in respect of voting their GPS-C Shares for six years from closing of the

2

Proposed Transaction, in accordance with the recommendations of the new management of GPS-C.

**Section 1.3 Conditions of Closing.**

The implementation of this LOI and the completion of the Proposed Transaction shall be subject to the various conditions precedent being satisfied prior to the date of closing of the Proposed Transaction (the **"Closing Date"),** including, among others:

(a)Conditions precedent for the benefit of GPS-C:

(i)SULL shall execute and deliver the Definitive Agreement which shall contain, among other things, the terms and conditions set forth herein and the warranties, representations, covenants, agreements, terms and conditions customarily found in such agreements and acceptable to GPS-C and its counsel;

(ii)receipt of all required approvals and consents for the Proposed Transaction, the Definitive Agreement and all related matters, including without limitation:

(A)the approval of the board of directors of GPS-C and SULL; and

(B)     the approval of GPS-C's and SULL's shareholders, if required by applicable corporate or securities laws; and

(C)     the approval of any applicable securities regulatory authorities and securities exchanges.

(iii)no material adverse change shall have occurred in the business, results of operations, assets, financial condition or affairs of SULL, financial or otherwise, between the date of signing this LOI and the completion of the Proposed Transaction;

(iv)satisfactory completion of due diligence by GPS-C, its counsel or other representatives on the business, assets, financial condition, and corporate records of SULL;

(v)there being no debts or amounts owing to SULL by any of its officers, former officers, directors, former directors, shareholders, employees or former employees or any family member thereof, or any person with whom SULL does not deal at arm's length, except for any amounts advanced to such person for expenses incurred on behalf of SULL in the ordinary course or as otherwise disclosed to GPS-C;

(vi)there being no legal proceeding or regulatory actions or proceedings against SULL at the Closing Date which may, if determined against the interest of SULL, have a material adverse effect on SULL;

(vii)there being no prohibition at law against the consummation of the Proposed Transaction;

(viii)no inquiry or investigation (whether formal or informal) in relation to SULL or its directors or officers, shall have been commenced or threatened by any relevant securities commission or similar regulatory body having jurisdiction, such that the outcome of such inquiry or investigation could have a material adverse effect on GPS-C after giving effect to the Proposed Transaction;

(ix)SULL shall be in compliance in all material respects with the terms of this LOI; and

(x)there shall be no material breach of the covenants of SULL contained herein or in the Definitive Agreement.

(b)Conditions precedent for the benefit of SULL:

(i)GPS-C shall execute and deliver the Definitive Agreement which shall contain, among other things, the terms and conditions set forth herein and the warranties, representations, covenants, agreements, terms and conditions customarily found in such agreements and acceptable to SULL and its counsel;

3

(ii)receipt of all required approvals and consents to the Proposed Transaction, and the Definitive Agreement and all related matters, including without limitation:

(A)the approval of the board of directors of GPS-C and SULL; and

(B)     the approval of GPS-C's and SULL's shareholders, if required by applicable corporate or securities laws; and

(C)     the approval of applicable securities regulatory authorities and securities exchanges.

(iii)the GPS-C Shares issued in consideration for the SULL Shares shall be issued as fully paid and non-assessable common shares in the capital of GPS-C, free and clear of any and all encumbrances, liens, charges, demands of whatsoever nature, except those imposed pursuant to statutory "hold periods" and escrow restrictions of applicable corporate or securities laws;

(iv)the Board Nominees shall have been duly appointed as of the time of completion of the Proposed Transaction;

(v)no material adverse change shall have occurred in the business, results of operations, assets, liabilities, financial condition or affairs of GPS-C, financial or otherwise, between the date of signing this LOI and the completion of the Proposed Transaction;

(vi)satisfactory completion of due diligence by SULL, its counsel or other representatives on the business, assets, financial condition, and corporate records of GPS-C;

(vii)GPS-C shall not be in default of the requirements of any securities commission and no order shall have been issued preventing the Transaction (or instituting any cease trade order of any securities of GPS-C);

(viii)there being no debts or amounts owing to GPS-C by any of its officers, former officers, directors, former directors, shareholders, employees or former employees or any family member thereof, or any person with whom GPS-C does not deal at arm's length, except for any amounts advanced to such person for expenses incurred on behalf of GPS-C in the ordinary course or as otherwise disclosed in writing to SULL and addressed before closing to the reasonable satisfaction of SULL;

(ix)there being no legal proceeding or regulatory actions or proceedings against GPS-C at the Closing Date which may, if determined against the interest of GPS-C, have a material adverse change on GPS-C;

(x)there being no prohibition at law against consummation of the Proposed Transaction or, if applicable, acquiring the SULL Shares or against the shareholders of SULL accepting the offer;

(xi)no inquiry or investigation (whether formal or informal) in relation to GPS-C or its directors or officers, shall have been commenced or threatened by any officer or official of any securities commission, or similar regulatory body having jurisdiction such that the outcome of such inquiry or investigation could have a material adverse effect on GPS-C; and

(xii)GPS-C shall be in compliance in all material respects with the terms of this LOI.

**Section 1.4 Conditions of Closing and Right of Waiver.**

The conditions precedent set out in Section 1.3(a) are inserted for the sole benefit of GPS-C and the conditions precedent set out in Section 1.3(b) are inserted for the sole benefit of SULL. Any of the parties may refuse to proceed with the closing of the Proposed Transaction if any condition precedent inserted for its benefit is not fulfilled to its reasonable satisfaction prior to the Closing Date and, except as otherwise agreed in this LOI, it shall incur no liability to any other party by reason of such refusal. The said conditions precedent, where not otherwise required by law, may be waived in whole or in part by the party for whose benefit they are inserted in that party's absolute discretion. No such waiver shall be of any effect unless it is in writing signed by the party granting the waiver.

4

**Section 1.5 Access to Information.**

In connection with the due diligence investigation to be undertaken by each of the parties in respect of the Proposed Transaction, each party will allow the other and its respective authorized representatives, including legal counsel and consultants, access to all information, books or records and its personnel as may be reasonably requested, subject to the Confidentiality terms referred to in Section 2.4 of this Agreement. Each party shall also cause its directors, employees, accountants and other agents and representatives to cooperate fully with the other party and its representatives in connection with the said due diligence investigation. Each party will be under no obligation to continue with its due diligence investigation or negotiations regarding a Definitive Agreement if, at any time, the results of its due diligence investigation are not satisfactory to such party for any reason in its sole discretion and such party agrees to provide prompt notification of termination of this LOI pursuant to Section 3.3(b) or Section 3.3(c), as applicable.

**Section 1.6 Securities Transfer Restrictions and Escrow.**

The parties acknowledge that the GPS-C Shares to be issued as part of the Proposed Transaction are not subject to restrictions on resale contained in GPS-C's constating documents, but may be subject to such restrictions on resale as are required by law and/or as required by any applicable securities exchange, if any, such as a four-month hold or an escrow.

**Section 1.7 Conduct of Business.**

(a)From the date of the acceptance of this LOI until the earlier of the completion of the transactions contemplated herein or the Termination Date (as defined herein), GPS-C and SULL will each operate its business in a prudent and business-like manner in the ordinary course, in a manner consistent with past practice and in compliance with Section 1.7(b) or Section 1.7(c), as applicable.

(b)     GPS-C hereby agrees from the date hereof until the Termination Date:

(i)Deleted;

(ii)if any securities exchange approval is required, to use its reasonable commercial efforts to obtain such approvals (subject to obligations of SULL to cooperate);

(iii)to use its reasonable commercial efforts to cause all directors and officers of GPS-C, and all shareholders holding 10% or more of all issued and outstanding GPS-C Shares, to enter into customary lock-up agreements in form and substance acceptable to SULL (acting reasonably) pursuant to which they shall agree (A) to vote all GPS-C Shares held by them in favour of the Proposed Transaction, (B) not to solicit other transactions and will otherwise support the Proposed Transaction, and (C) not to sell or dispose of any GPS-C Shares that they hold, each until the earlier of (x) the Closing Date, and (y) the Termination Date;

      (iv)    not to issue any debt or equity or other securities without the prior written consent of SULL (acting reasonably), except pursuant to any Private Placement and/or LTIP (long-Term Incentive Plan) and/or with the prior written consent of SULL (acting reasonably) for purposes of settling indebtedness or for raising capital for the resulting issuer upon closing;

      (v)    not to borrow any money or incur any indebtedness (except for trade payables incurred in the ordinary course) without the prior written consent of SULL (acting reasonably);

      (vi)    not to make loans, advances or other similar payments to any party, excluding advances reasonably necessary to carry out the terms of this LOI or as is agreed to by SULL in writing;

      (vii)    not to make any expenditures outside the normal course of business except those that are reasonably necessary to carry out the terms of this LOI, or that are incurred to reimburse directors or officers for reasonable expenses incurred for the foregoing purposes without the prior written consent of SULL (acting reasonably);

<table>
<tr><td>(viii)</td><td>not to declare or pay any dividends or distribute any of GPS-C's properties or assets to shareholders;</td></tr>
<tr><td>(ix)</td><td>not to alter or amend GPS-C's articles or notice of articles in any manner which may adversely affect the success of the Proposed Transaction, except as is agreed to by SULL in writing and as required to give effect to the matters contemplated herein; and</td></tr>
<tr><td>(x)</td><td>not to enter into any transaction or material contract (outside the normal course of business), except as reasonably necessary to give effect to the matters contemplated herein.</td></tr>
</table>

(c)     SULL hereby agrees from the date hereof until the Termination Date:

(i) to use its reasonable commercial efforts to cause all SULL directors and officers to vote their SULL Shares in favor of the Proposed Transaction, convey to GPS-C such SULL Shares pursuant to the Proposed Transaction, and otherwise take all reasonable actions to complete the Proposed Transaction and to not take any action contrary to or in opposition to the Proposed Transaction;

(ii) If any securities exchange approval is required, to cooperate with GPS-C to provide information required for GPS-C to use its reasonable commercial efforts to make all required and appropriate applications and disclosures;

(iii) to use its reasonable commercial efforts to cause all directors and officers of SULL and all shareholders holding 10% or more of all issued and outstanding shares of SULL, to enter into customary lock-up agreements in form and substance acceptable to GPS-C (acting reasonably) pursuant to which they shall agree (A) to vote all SULL Shares held by them in favour of the Proposed Transaction, (B) not to solicit other transactions and will otherwise support the Proposed Transaction, and (C) not to sell or dispose of any shares of SULL that they hold, each until the earlier of (x) the Closing Date, and (y) the Termination Date;

(iv) not to issue any debt or equity or other securities, without the prior written consent of GPS-C (acting reasonably), as consideration for arm's length acquisitions;

(v) not to make loans, advances or other similar payments to any party, excluding routine advances to employees of SULL for expenses incurred in the ordinary course or as is agreed to by GPS-C in writing;

(vi) not to declare or pay any dividends or distribute any of SULL's properties or assets to shareholders;

(vii) not to alter or amend SULL's articles or by-laws in any manner which may adversely affect the success of the Proposed Transaction, except as is agreed to by GPS-C in writing or as strictly required to give effect to the matters contemplated herein; and

(viii) to use its reasonable commercial efforts to obtain any third parties approvals required in respect of the Proposed Transaction.

## ARTICLE 2
## SURVIVING BINDING PROVISIONS

**Section 2.1 Survival of Provisions.**

In recognition of the costs to be borne by each of the parties in pursuing the Proposed Transaction and in further consideration of their respective undertakings as to the matters described in this LOI, the provisions set out in this ARTICLE 2 will be legally binding and enforceable upon execution of this LOI by the parties and will survive in the event that this LOI is terminated (the **"Surviving Binding Provisions"**).

**Section 2.2 Disclosure Restrictions.**

No disclosure or announcement, public or otherwise, in respect of this LOI or the transactions contemplated herein or therein will be made by any party without the prior written agreement of the other party as to timing, content and method, hereto, provided that the obligations herein will not prevent any party from making, after consultation with the other party,

such disclosure as its counsel advises is required by applicable law or the rules and policies of any securities regulatory authority having jurisdiction over it.

### Section 2.3 Costs.

Each party shall be responsible for its costs, including legal, accounting, financial, valuation and other professional fees incurred in connection with this LOI, the negotiation, preparation and execution of the Definitive Agreement, or any agreements otherwise relating to the Proposed Transaction.

### Section 2.4 Confidentiality.

(a)All information discovered or acquired by each of the parties hereto (the **"Confidential Information"),** in any form whether written, electronic or verbal, as to financial condition, business, properties, title, assets and affairs (including any material contracts) as may reasonably be requested by the other party, will be kept confidential by the receiving party hereto and not be utilized for any purpose except in connection with the Proposed Transaction, notwithstanding either the termination of this LOI or its completion, other than information that:

(i)was generally available to the public prior to the date of this LOI or has become, other than due to the default of the other party, generally available to the public;

(ii)was available to a party on a non-confidential basis before the date of this LOI;

(iii)has become available to a party on a non-confidential basis from a person who is not otherwise bound by confidentiality obligations to the provider of such information or otherwise prohibited from transmitting the information to the party; or

(iv)a party is legally required or compelled to disclose under applicable law or in any governmental, administrative, or judicial process.

(c)No Confidential Information may be released to third parties other than legal counsel and other advisors to the parties without the prior written consent of the provider thereof, except to the extent that such Confidential Information is compelled to be released by legal process or must be released to regulatory bodies or must be included in publicly filed documents.

(d)All such Confidential Information in written form and documents will be returned to the party originally delivering them in the event that the Proposed Transaction is not consummated.

### Section 2.5 Due Diligence.

Each party agrees to provide the other party and its legal, financial, and business advisors, and that such advisors to be under confidentiality provisions similar to Section 2.4, with reasonable access to all of its books and records and material documents, and to their respective key personnel for purposes of conducting due diligence. All due diligence investigations will be conducted under the terms of Section 2.4 hereof (Confidentiality).

### Section 2.6 General.

(a)Amendment. This LOI may only be amended, supplemented or otherwise modified by written agreement signed by all of the parties.

(b)     Counterparts. This LOI may be executed in any number of counterparts, and all such counterparts taken together will be deemed to constitute one and the same instrument. Any party delivering an executed counterpart by facsimile or other electronic means will also deliver a manually executed counterpart of this LOI.

(c)     Severability. Each provision of this LOI is intended to be severable, and if any provision is illegal, invalid or unenforceable in any jurisdiction, this will not affect the legality, validity or enforceability of such provision in any other jurisdiction or the validity of the remainder of this LOI.

7

(d)    <u>Governing Law</u>, This LOI will be interpreted and enforced in accordance with the laws of the State of Delaware and the federal laws of the United States of America applicable therein. Each party irrevocably attorns and submits to the non-exclusive jurisdiction of the Delaware Court of Chancery and waives objection to the venue of any proceeding in such court or that such court provides an inconvenient forum.

**ARTICLE 3**
**NON-SURVIVING BINDING PROVISIONS**

**Section 3.1 Non-Surviving Binding Provisions.**

In recognition of the costs to be borne by each of the parties in pursuing the Proposed Transaction and in further consideration of their respective undertakings as to the matters described in this LOI, the provisions set out in this ARTICLE 3 will be legally binding and enforceable upon execution of this LOI and will terminate upon termination of this LOI (the "**Non-Surviving Binding Provisions**").

**Section 3.2 Non-Solicitation and Exclusivity.**

During the period commencing on the date of this LOI and continuing until the earlier of (i) the Closing Date, (ii) the Termination Date, and (iii) the Exclusivity Termination Date (as defined below), each party agrees that it will not, directly or indirectly, and will not authorize or permit any representative or agent thereof to, directly or indirectly, (a) solicit, initiate, encourage, engage in or respond to any inquiry or proposal regarding any merger, amalgamation, share exchange, business combination, take-over bid, sale or other disposition of all or substantially all of its assets, any recapitalization, reorganization, liquidation, material sale or issue of treasury securities or rights or interest therein or thereto or rights or options to acquire any material number of treasury securities or any type of similar transaction which would or could, in any case, constitute or result in a **de facto** change of control of either party or the disposition of substantially all of its assets (each an "**Acquisition Proposal"),** other than the Proposed Transaction, (b) encourage or participate in any discussions or negotiations regarding any Acquisition Proposal, (c) agree to, approve or recommend an Acquisition Proposal, or (d) enter into any agreement related to an Acquisition Proposal.

The respective parties' foregoing non-solicitation covenant and exclusive period shall terminate on October 31, 2022, (**the "Exclusivity Termination Date").**

**Section 3.3 Termination.**

This LOI will terminate automatically upon the execution of the Definitive Agreement or on the day (the **"Termination Date")** on which the earliest of the following events occurs:

(a)    written agreement of the parties to terminate the LOI;

(b)    GPS-C not being reasonably satisfied with its due diligence review of SULL and written notification of such is provided to SULL;

(c)    SULL not being reasonably satisfied with its due diligence review of GPS-C and written notification of such is provided to GPS-C;

(d)    any applicable regulatory authority having notified in writing either GPS-C or SULL that it will not permit the Proposed Transaction to proceed;

(e)    shareholders of GPS-C or SULL, not approving the Proposed Transaction and related matters in accordance with all applicable law, if such approval or approvals are required to complete the Proposed Transaction;

(f)    the Definitive Agreement is not entered into on or before the Exclusivity Termination Date, unless extended by mutual agreement between the parties;

(g)    10 business days after delivery of written notice from GPS-C to SULL of a material breach by SULL of

8

any of the Surviving Binding Provisions and Non-Surviving Binding Provisions, which SULL is unable to cure; or

(h)    10 business days after delivery of written notice from SULL to GPS-C of a material breach by GPS-C of any of the Surviving Binding Provisions and Non-Surviving Binding Provisions, which GPS-C is unable to cure,

provided that the termination of this LOI will not affect the liability of a party for breach of any of the Surviving Binding Provisions and Non-Surviving Binding Provisions prior to termination, nor of the Surviving Binding Provisions thereafter. Upon termination of this LOI, the parties will have no further obligations under this LOI, except with respect to the Surviving Binding Provisions which will survive in full force and effect, unamended.

**Section 3.4 Good Faith Negotiations.**

GPS-C and SULL agree to proceed diligently and in good faith to negotiate and settle the terms of the Definitive Agreement that will provide the basis upon which the parties will affect the Proposed Transaction.

To confirm acceptance of the foregoing, please countersign the enclosed duplicate copy of this LOI where indicated below, and deliver same to the GPS-C.

**[Balance of page intentionally left blank; signature page follows]**

Yours very truly,

9

**GPS Company**


By : _____
       A.S.O.: Blair Krueger


This LOI reflects accurately the understanding and agreement of each of the undersigned with respect to the matters set out above.


Confirmed July xx, 2022

**G.P. Sullins Land Company, LLC**


By : _____
       A.S.O.: John Keith Taylor

10

SCHEDULE "A"

Details of the Companies' Outstanding and Proposed Share Structures – Attached



# Exhibit B

**CONSULTING SERVICES AGREEMENT**

~~This~~THIS Consulting Services Agreement (the "**Agreement**") is made effective ~~this 1ˢᵗ day of~~ September 1, 2022 (the "**Effective Date**"), by and between

~~B E T W E E N:~~

G.P. SULLINS LAND COMPANY, LLC, a North Carolina~~, USA~~ limited liability company (hereinafter referred to as "~~Company~~**GPSLC**")

-and-



~~GPS QRTZ CORP., a Delaware, USA company~~
[                              ], a                [                              ]
(hereinafter referred to as "~~CS~~**Consultant**"; and together with GPSLC, each a "**Party**" and collectively, the "**Parties**").

**WHEREAS** ~~Company,~~ GPSLC is primarily engaged in the business of holding and managing a series of tenant-in-common interests in real property located in North Carolina that is principally located at _____, which is a prospective high purity quartz mineral property (the "**Property**"); and

~~AND~~ **WHEREAS** ~~CS,~~ Consultant provides consulting services related to ~~:~~ mine exploration & management~~, corporate governance, corporate strategy, operations management, corporate finance, financial communications, and related services;~~; and

~~AND~~ **WHEREAS** ~~Company,~~ GPSLC desires to ~~contract for~~engage Consultant to provide the consulting services ~~of CS and CS desires to enter into an agreement to provide such consulting services~~described herein with respect to the Property, on the terms and conditions of this Agreement, and Consultant desires to accept such engagement;

**NOW THEREFORE THIS AGREEMENT WITNESSES THAT** ~~in consideration of the sum of TWO ($2.00) Dollars (now paid by each party to the other the receipt and sufficiency of which is acknowledged and confirmed by each of the parties hereto), the promises and covenants herein provided and other,~~ for good and valuable consideration, the sufficiency of which is hereby acknowledged ~~and recognized by the said parties, Company and CS covenant and~~by the Parties, the Parties hereby agree as follows:

1. ~~CS~~**CONSULTANT - CONSULTING SERVICES**.

   **1.1** ~~CS~~Primary Services. Consultant agrees to provide ~~the following~~ consulting services, as further ~~articulated~~described in Schedule A hereto, to ~~Company~~GPSLC on a non-exclusive basis during the Term (as hereinafter defined) with respect to the following

4892-3630-0344.v4

matters relating to the business affairs of ~~Company~~GPSLC and which consulting services shall be performed pursuant to the terms of this Agreement (hereinafter collectively referred to as the "**Services**")~~:~~.

~~1.1 Mine Exploration & Management;~~

~~1.2 Corporate Governance;~~

~~1.3 Corporate Strategy;~~

~~1.4 Operations Management;~~

~~1.5 Corporate Finance;~~

~~1.6 Financial Communications; and~~

~~1.7 Related Services.~~

**1.2**    Scope of Services. The Services shall be performed principally by Blair Krueger ("**Krueger**") and Frank Salvati ~~of CS, from the Company's offices located in Gastonia, NC, USA & Toronto, ON, Canada, and such other locations as may be required and determined by CS~~("**Salvati**"), with each making site visits to the Property as reasonably required from time to time in order to render the Services in a commercially reasonable manner. For all matters relating to the performance of the Services, ~~CS~~Consultant shall report to and receive instructions from ~~the Officers of the Managers of Company, and as it may further direct, and shall also have direct access to and consult with any relevant committee of the Officers, Managers (and/or like body) of Company as and when required by CS. The **Business Plan** (including Budget) articulated in the Deck in **Schedule B** hereto shall form the guide for the Services.~~ one or more of GPSLC's President, Vice-President, or Secretary/Treasurer (together the "**Leadership Team**"). Neither Consultant nor any of its agents, employees, or officers shall be agents of GPSLC and none of them shall have authority to bind GPSLC without the express written consent of a member of the Leadership Team. Without limiting the foregoing, Consultant is not authorized (and Consultant hereby agrees not) to sell, attempt to sell, or market any securities (including equity or debt offerings) directly or indirectly for or on behalf of GPSLC or any of its members, managers, or officers. Any and all work product that is produced as a result of the rendering of the Services shall be the sole and exclusive property of GPSLC and Consultant shall, during the Term and thereafter, take all steps reasonably necessary to assign to GPSLC all such work product to the extent reasonably requested by a Manager of GPSLC from time to time.

2.    **PROVISION OF EQUIPMENT AND MATERIALS**

. In connection with and as reasonably necessary to render the Services, GPSLC ~~COMPANY~~ shall provide to ~~CS, IN ADDITION TO OTHER COMPENSATION PAYABLE OR PROVIDED BY COMPANY TO CS PURSUANT TO THIS AGREEMENT,~~Consultant connectivity-access to and the use of ~~COMPANY'S~~GPSLC's computer equipment, software programs, tools and other materials and infrastructure as reasonably required by ~~CS~~Consultant in order to facilitate the performance of the Services by ~~CS~~Consultant (collectively referred to as the "**Equipment and Materials**"), including, without limitation, access to and the use of such of the Equipment and Materials in order to permit ~~CS~~Consultant to operate and perform the Services remotely from offices of ~~CS~~Consultant or at such other locations as is reasonably required by ~~CS~~Consultant.

## 3.    CONSULTING FEE.

~~3. CONSULTING FEES, BUSINESS INCENTIVE PLAN, STOCK AND TERM OF THE AGREEMENT~~

**3.1**    The term of this Agreement shall be for a period of one (1) year commencing on ~~September 1st, 2022~~the Effective Date and expiring on August ~~31st~~31, 2023 (referred to as the "**Term**"), unless terminated earlier or as may be mutually agreed upon in writing by the ~~parties hereto~~Parties. In consideration of the compensation payable by the ~~Company~~GPSLC to ~~CS~~Consultant for the performance of the Services pursuant to this Agreement, including without limitation, the ~~Annual Base~~ Consulting ~~Fees~~Fee (as the term is defined in this Agreement), ~~CS~~Consultant shall provide no more than 1,600 hours of work annually on account of the performance of the Services~~, as agreed and directed with Company acting reasonably, and only between the hours of 8AM-6PM Eastern Standard Time (EST) weekly throughout the Term (excluding Saturday, Sunday and Statutory Holidays in the jurisdiction of authority);~~ and no less than _____ hours of work annually on account of the performance of the Services (pro-rated for any portion of the year for which this Agreement is in effect), on a schedule mutually agreed to by the Parties;

**3.2**    ~~The Company~~GPSLC shall pay ~~CS~~Consultant, without set-off or deduction, the sum of ~~Two Hundred and Forth Thousand (US$240,000.00) Dollars 'USA' plus any applicable value added tax (referred to as the "**VAT**") per annum (collectively referred to as the "**Annual Base Consulting Fees**"), payable in equal monthly payments of Twenty Thousand (US$20,000.00) Dollars 'USA' plus any applicable VAT, throughout the Term (referred to as the "**Monthly Base Consulting Fees**"), which shall be payable in the amount of Twenty Thousand (US$20,000.00) Dollars plus any applicable VAT on the last day of each and every month throughout the Term, as part of the compensation payable by Company to CS for the performance of the Services, and the first such payment of which shall be due and payable on September 30th, 2022, and correspondingly made. The Annual Base Consulting Fees shall be in addition to and not in substitution of any other compensation or benefits payable or provided by Company to CS as expressly set out in this Agreement;~~Twenty Thousand U.S. Dollars (US$20,000.00) per calendar month throughout the Term (the "**Consulting Fee**"). Within ten (10) days following the end of each calendar month during the Term, Consultant will deliver monthly invoices for the Consulting Fee to GPSLC and GPSLC will pay such invoices within fifteen (15) days of the receipt of each such invoice. Notwithstanding the foregoing, in the event of any early termination of this Agreement as provided for herein, the Consulting Fee shall be pro-rated through the effective date of such termination.

**3.3**    ~~Company~~GPSLC shall reimburse ~~CS~~Consultant for any ~~approved~~ costs, charges or expenses whatsoever reasonably incurred or sustained by ~~CS~~Consultant in the performance of the Services ~~forthwith~~ upon presentation of such costs, charges or expenses to ~~Company;~~

~~3.4~~ GPSLC; provided, however, that no such costs, charges or expenses shall be reimbursed except with the express prior written approval of a member of the Leadership Team~~Deleted~~.

~~3.5 Deleted.~~

4892-3630-0344.v4

**3.4** ~~3.6 The Company~~GPSLC acknowledges and agrees that, during the ~~currency of this Agreement, CS~~Term, Consultant, together with its directors, officers, employees, shareholders, agents, successors, assigns, contractors and representatives shall not be prohibited or restricted, in any manner or capacity whatsoever, from providing or performing any services, which are the same or similar to the Services, to or on behalf of any other person, corporation or other entity, provided (i) such person, corporation or other entity engages in a business that does not materially compete with the business of ~~Company~~GPSLC and (ii) the rendering of such services does not result in, or is reasonably unlikely to result in, a conflict of interest for Consultant or any of its principals.

**3.5** ~~3.7~~ Any compensation to be payable and/or granted by ~~Company to CS~~GPSLC to Consultant shall be without set-off or deduction whatsoever, except to the extent required under applicable law.

**4.** ~~EXPIRY OR~~ TERMINATION.

~~3.8 Deleted.~~
~~3.9 In the event this Agreement is terminated for any reason whatsoever, whether by Company or otherwise, save and except due to the gross negligence of CS (as determined by a court of law pursuant to paragraph 8 herein) or termination of this Agreement by CS pursuant to section 3.10 of this Agreement, or in the event the individuals who, as of the date of execution of this Agreement, constitute the officers of Company cease for any reason to constitute at least a majority of such officers, or, in the event the Chief Executive Officer of Company as of the date of execution of this Agreement resigns, is dismissed or otherwise is no longer the Chief Executive Officer of Company, then in each such event, Company shall forthwith pay and provide to CS: (i) an additional amount of compensation (in addition to the Annual Base Consulting Fees as set out in section 3.2) equal to one-half times the sum of the Annual Base Consulting Fees (i.e. Annual Base Consulting Fees multiplied by 1/2); (ii) an amount equal to that portion of Annual Base Consulting Fees for the balance of the Term of the Agreement that would be remaining but for the termination thereby or the balance of the Term of the Agreement that would be remaining at the time of the occurrence of any of the other foregoing events in this section 3.9 of this Agreement hereby; and, (iii) any other outstanding amounts.~~
~~Company acknowledges, confirms, and agrees that the compensation payable to CS pursuant to this section 3.9 shall be in addition to and not in substitution of any other amounts on account of compensation payable (whether accrued or otherwise) to CS pursuant to this Agreement and is also in addition to and not in substitution of any other remedies that may be available to CS.~~
~~For the purposes of this section 3.9 of this Agreement, in the event this Agreement is terminated for any reason whatsoever, whether by Company or otherwise, save and except due to the gross negligence of CS (as determined by a court of law pursuant to paragraph 8 herein) or termination of this Agreement by CS pursuant to section 3.10 of this Agreement, or, in the event the individuals who, as of the date of execution of this Agreement, constitute the officers of Company cease for any reason to constitute at least a majority of such officers, or, in the event the Chief Executive Officer of Company as of~~

~~the date of execution of this Agreement resigns, is dismissed or otherwise is no longer the Chief Executive Officer of Company, the following shall be deemed to have occurred notwithstanding anything to the contrary in this Agreement and/or at law: (a) the Annual Base Consulting Fees shall be accelerated and deemed earned by CS for the Term; (b) Deleted.~~

**4.1** ~~3.10~~ Either ~~party~~<u>Party</u> may terminate this Agreement <u>during the Term</u>, in ~~their~~<u>its</u> sole discretion, upon providing ~~ninety~~<u>ten</u> (~~90~~<u>10</u>) days prior written notice to the other ~~party,~~<u>Party;</u> provided<u>,</u> however, ~~and~~<u>that</u> notwithstanding anything <u>else herein</u> to the contrary ~~in~~<u>, either Party may terminate</u> this Agreement~~,~~ <u>effective immediately</u> in the event of ~~termination by Company for any reason whatsoever, other than the gross negligence of CS (as determined by a court of law pursuant to paragraph 8 herein), Company shall forthwith pay CS, in addition to and not in substitution of any other compensation payable by Company to CS pursuant to this Agreement, the compensation as set out in section 3~~<u>a breach by either Party of any provision</u> of this Agreement <u>that is not promptly cured</u>.

**4.2** ~~3.11~~ The notice of termination of this Agreement by either ~~Company~~<u>GPSLC</u> or ~~CS~~<u>Consultant</u>, pursuant to the terms of this Agreement, shall be provided in writing and given by verifiable personal delivery, overnight courier ~~or~~<u>,</u> by registered mail. ~~Notice by mail shall be deemed to have been given on the tenth business day after the date of mailing~~<u>, or by email</u>.

**4.3** ~~3.12~~ Any terms of this Agreement relating to the <u>payment</u> obligations of ~~Company, including without limitation, the Company's obligation to pay and/or provide compensation to CS pursuant to~~<u>GPSLC through the date of expiration or termination of</u> this Agreement shall survive ~~the expiry or any~~<u>any such expiration or</u> termination ~~of this Agreement until such obligations of Company are satisfied~~.

4892-3630-0344.v4

5. **CONFIDENTIALITY.** The Parties entered into that certain Mutual Confidentiality Agreement dated effective _____ (the "NDA"). The NDA remains in full force and effect. Notwithstanding anything in the NDA to the contrary and without limiting the terms and conditions of the NDA, Consultant hereby agrees that (i) Consultant will keep confidential and shall not disclose to any person or entity, any information relating to GPSLC, the Property, or the members, managers, or officers of GPSLC that is confidential or proprietary in nature and (ii) use such information for any purpose other than in connection with this Agreement

6. ~~4. CONFIDENTIALITY~~**GENERAL RELATIONSHIP.**
~~All information acquired by a party from another party relating to Company and/or CS shall be treated as confidential by the recipient and cannot be used otherwise than for the purpose of the collaboration under this Agreement without the prior written consent of the party providing the information, unless such information is or later becomes public other than by breach of this confidentiality by a party or is required to be disclosed by law or pursuant to any legal proceeding. This provision shall survive the expiry or termination of this Agreement.~~

   **6.1** In all matters relating to this Agreement, Consultant shall be acting as an independent contractor. Neither Consultant nor employees of Consultant (if any) are employees of GPSLC under the meaning or application of any federal or state unemployment or insurance laws or worker's compensation laws, or otherwise. Consultant shall assume all liabilities or obligations imposed by any one or more of such laws with respect to employees of Consultant (if any) in their performance of this Agreement

   **6.2** GPSLC will have limited control or direction over the Services provided by Consultant hereunder (except as to specifying the nature of the projects on which Consultant's Services are sought) and Consultant will perform Services hereunder as an independent contractor.

7. **REPRESENTATIONS AND WARRANTIES.** Each of Consultant, Krueger, and Salvati (together, each a "**Consulting Party**" and collectively, the "**Consulting Parties**"), on a joint and several basis, with respect to Consultant and themselves individually, hereby represent and warrant to GPSLC on the Effective Date and during the Term as follows:

   **7.1** Each Consulting Party has the right to enter into this Agreement, to grant the rights granted herein, and to perform fully all of the obligations that each has agreed to perform under this Agreement;

   **7.2** Entering into this Agreement with GPSLC and the performance of the Services do not and will not conflict with or result in any breach or default under any other agreement to which any Consulting Party, directly or indirectly, is subject;

   **7.3** There are no claims, actions, demands, or proceedings pending or, to the knowledge of any Consulting Party, threatened against any Consulting Party that adversely affects or reasonably could have an adverse effect on the Property or the ability of the Consulting Parties to perform the Services;

**7.4** Each Consulting Party has the required skill, experience, and qualifications to perform the Services, and shall perform the Services in a professional and workmanlike manner in accordance with generally recognized industry standards for similar services, and shall devote sufficient resources to ensure that the Services are performed in a timely and reliable manner; and

**7.5** Each Consulting Party shall perform the Services in compliance with all applicable federal, state, and local laws and regulations, including by maintaining all licenses, permits, and registrations required to perform the Services;

8. **INDEMNITY**. Each Consulting Party hereby agrees, on a joint and several basis, to defend and hold GPSLC and each of its members, managers, and officers harmless from and against any and all claims, losses, proceedings, or actions arising from or related to any breach by any Consulting Party of Section 7 of this Agreement.

9. ~~5. ~~ASSIGNMENT OF AGREEMENT

Neither ~~COMPANY NOR CS~~Party shall assign this Agreement without the written authorization of the other ~~PARTY~~Party.

~~6. SEVERABILITY~~

10. ~~COMPANY AND CS~~SEVERABILITY. The Parties hereby agree that if any of the provisions or a part of a provision of this Agreement are deemed illegal or unenforceable, such provisions shall be considered separate and severable from this Agreement, and the remaining provisions or part of a provision of the Agreement shall continue in force and be binding upon the parties as though such provision or part of a provision had never been included.

~~7. ENTIRE AGREEMENT~~

11. **ENTIRE AGREEMENT.** This Agreement and the NDA constitutes the entire agreement between the parties. There are no other agreements, understandings, representations or warranties, collateral, oral or otherwise.

~~8. GOVERNING LAW~~

12. ~~THE GOVERNING LAW SHALL BE~~GOVERNING LAW. This Agreement and the relationship between the Parties with respect thereof shall be governed by the laws of the State of North Carolina, ~~USA, THE JURISDICTION OF AUTHORITY. THE PARTIES~~without regard to conflicts of law provisions. The Parties agree to submit any disputes as to the validity, interpretation, or performance of this Agreement to the courts of the jurisdiction of authority, in ~~THE CITY OF~~ Charlotte, North Carolina.

~~9. MODIFICATION~~

13. **MODIFICATION.** No amendment, modification or supplement to this Agreement shall be of any force and effect unless it is agreed to in writing by both ~~PARTIES~~Parties.

10. HEADINGS

14.     **HEADINGS.** The headings utilized in this Agreement are for convenience only and are not to be construed in any way as additions or limitations of the terms and conditions in this Agreement.

11. WAIVER

15.     **WAIVER.** The failure of ~~COMPANY~~GPSLC or ~~CS~~Consultant to exercise any of its rights upon breach of any of the provisions of this Agreement shall not be deemed a waiver unless such waiver is expressed in writing and signed by the party waiving such right and such waiver shall not be deemed a waiver as to any subsequent breach.

12. DOLLAR AMOUNTS

16.     **DOLLAR AMOUNTS.** All reference to dollar amounts in this Agreement or the Schedules attached hereto refer to 'USA' funds.

17.     ~~13.~~ **THE PARTIES ACKNOWLEDGE AND AGREE THAT THIS AGREEMENT AND DOCUMENTS PREPARED PURSUANT THERETO WERE NEGOTIATED BETWEEN THE PARTIES WITH THE BENEFIT OF THE OPPORTUNITY TO OBTAIN PRIOR INDEPENDENT LEGAL ADVICE AND ACCORDINGLY, ANY CONFLICT, AMBIGUITY, DEFICIENCY CONTAINED IN THIS AGREEMENT SHALL NOT BE CONSTRUED AGAINST ANY PARTY TO THIS AGREEMENT AND THE DOCTRINE OF CONTRA PROFERENTEM SHALL NOT APPLY TO THIS AGREEMENT.**

18.     ~~14.~~ This Agreement shall enure to the benefit of and be binding upon the ~~PARTIES HERETO~~Parties and their respective representatives, administrators, successors and permitted assigns.

**[Balance of page intentionally left blank; signature page follows.]**

**IN WITNESS WHEREOF** the parties hereto have caused this Agreement to be executed and effective as of September 1st, 2022

4892-3630-0344.v4

**G.P. SULLINS LAND COMPANY, LLC**


BYBy:
_____

Name: _____

Title: _____


[_____]


By: _____

Name: _____

Title: _____


~~Name:~~
~~Title: A.S.O.~~
~~I have authority to bind the Corporation.~~


~~GPS QRTZ CORP.~~
~~BY:~~

_____

~~Name: Frank Salvati~~
~~Title: A.S.O.~~
~~I have authority to bind the Corporation.~~

Acknowledged and agreed to by each of the undersigned, in their individual capacities, who are also entering into Section 7 and Section 8 of this Agreement in their individual capacities:


_____

Frank Salvati

4892-3630-0344.v4

Blair Krueger

## Schedule A – CONSULTING SERVICES

**1.1 Mine Exploration & Management**
- 
- 
- 
- 

~~1.2 Corporate Governance:~~
- 
- 
- 
- 

~~1.3 Corporate Strategy:~~
- 
- 
- 
- 

~~1.4 Operations Management:~~
- 
- 
- 
- 

~~1.5 Corporate Finance:~~
- 
- 
- 
- 

~~1.6 Financial Communications:~~
- 

4892-3630-0344.v4

- 
- 
- 

**1.2**  1.7 **Related Services:**

- 
- 
- 
- 

Schedule A — BUSINESS PLAN [DECK including BUDGET]

ATTACHED

4892-3630-0344.v4

| Summary report: Litera Compare for Word 11.3.1.3 Document comparison done on 8/15/2023 11:37:00 AM | |
|---|---|
| **Style name:** Default Style | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** nd://4892-3630-0344/1/Consulting Services Agreement - GPSLC - Frank and Blair (September 2022).docx | |
| **Modified DMS:** nd://4892-3630-0344/4/Consulting Services Agreement - GPSLC - Frank and Blair (September 2022).docx | |
| **Changes:** | |
| Add | 162 |
| Delete | 196 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 5 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 363 |



*G.P. Sullins Land Company, LLC*
*905 US HWY 321 NW*
*Hickory, NC 28601*

July 6, 2023

GPS QRTZ Corp.
c/o Sagegate Corporation
360 Bay St.
Toronto, ON M5H 2V6

Frank and Blair,

G.P. Sullins Land Company, LLC (the "Company") has received the last three invoices from you for $20,000 each (invoice 0404302023, invoice 0505312023 and invoice 0606302023 ), referenced as "Per Consulting Services Agreement, for the 1-month periods ended April 2023, May 2023 and June 2023."

As you know, there is not currently, nor has there ever been, a written agreement in place between the Company and either of you or your company. We acknowledged and paid for a discrete service project relating to a drilling program. We had an oral understanding. We have paid for all services rendered and have not requested any additional services. The Company does not owe any additional payments. Respectfully, we have no intention of paying these or future invoices as we are not obligated to do so. There have been no additional services provided since the operational core extraction phase of our internal project concluded in March 2023.

The Company verbally committed to pay you $20,000 a month on a month-to-month basis for consultation services relative to executing a core extraction program based on a verbal understanding of our need and your value to satisfy that immediate need. Those services have yielded no material work product since April 2023, shortly after the core extraction campaign concluded.

We also want to be clear that you are not authorized to act on behalf of the Company. You are not an agent of the Company, nor do you have any ownership or other interest in the assets of the Company. Therefore, you are not authorized, nor have you ever been authorized to operate on behalf of the Company, and we ask that you not hold yourselves out as being representatives of the Company. We are not engaged in any business with either of you and will not do so in the future without a signed written agreement.

Respectfully, we understand your clear intentions to put a deal together with us in the future, but we do not ask for or require your consultation, counsel, or advice with respect to our projects at this time.

We have constantly and consistently informed you that the Company will make no decision on next steps until we conclude the NI 43-101 report with SRK, and that is an internal corporate matter being handled by internal management. Like other interested parties, you are welcome to present your option at that time for consideration by the Company.

On behalf of the Company, I respectfully request that you please cease and desist from making calls to any vendors related to the Company or the property it owns.

Respectfully,


Athos (Tos) Rostan, III
Secretary Treasurer
G.P. Sullins Land Company, LLC

4881-9304-8172.v4



**ADAIR GOLDBLATT BIEBER LLP**

SIMON BIEBER
*Partner*
sbieber@agbllp.com
direct line: 416 351 2781

August 11, 2023

**SENT BY REGULAR MAIL:**

# Exhibit D

G.P. Sullins Land Company, LLC
905 US HWY 321 NW
Hickory, NC 28601

**SENT BY EMAIL TO: jtaylor@gpsullins.com**

John 'Keith' Taylor
Officer, Managing Member
G.P. Sullins Land Company, LLC
905 US HWY 321 NW
Hickory, NC 28601

**SENT BY EMAIL TO: rdickson6893@gmail.com abg@rlglawnc.com**

Ralph A. Dickson, III
Officer, Managing Member
G.P. Sullins Land Company, LLC
905 US HWY 321 NW
Hickory, NC 28601

**SENT BY EMAIL TO: mossprop@icloud.com**

Garrett 'Gary' Moss
Managing Member
G.P. Sullins Land Company, LLC
905 US HWY 321 NW
Hickory, NC 28601

**SENT BY EMAIL TO: cwkilowatts2@gmail.com**

Carl E. Watts, Jr.
Managing Member
G.P. Sullins Land Company, LLC
905 US HWY 321 NW
Hickory, NC 28601

45 WELLINGTON STREET WEST SUITE 1820 TORONTO ON M5J 2N7 | T 416 360 9030 F 647 689 2059
AGBLLP.COM

**SENT BY EMAIL TO: skipsyl@aol.com**

Gerald 'Skip' Sullins
Managing Member
G.P. Sullins Land Company, LLC
905 US HWY 321 NW
Hickory, NC  28601

**SENT BY EMAIL TO: Saturnbooks@hotmail.com**

Martha Bradshaw
Managing Member
G.P. Sullins Land Company, LLC
905 US HWY 321 NW
Hickory, NC  28601

**SENT BY EMAIL TO: vansullins@charter.net**

Richard 'Van' Sullins
Managing Member
G.P. Sullins Land Company, LLC
905 US HWY 321 NW
Hickory, NC  28601

**SENT BY EMAIL TO: admoore23@gmail.com; smeyers42@carolina.rr.com; donnatay50@icloud.com; annsullins@outlook.com; adickson@malinapa.com**

Non-Managing LLC Members At-Large, et al.
G.P. Sullins Land Company, LLC
905 US HWY 321 NW
Hickory, NC  28601

**SENT BY EMAIL TO: hpqlabs@gmail.com**

Hayden Moss
GP Deal Representative
G.P. Sullins Land Company, LLC
905 US HWY 321 NW
Hickory, NC  28601

**SENT BY EMAIL TO: jenna@jennarate.com**

Jenna Byron
GP Deal Representative
G.P. Sullins Land Company, LLC
905 US HWY 321 NW
Hickory, NC  28601

Dear Messrs and Madams:

**Re:**      **Agreement between GPS Quartz Corp. & G.P. Sullins Land Company, LLC, Members**

We act for GPS Quartz Corp. ("GPS"). We have your letter of July 6, 2023 (the "Letter") and write in response. In the Letter, G.P. Sullins Land Company LLC and by extension its Members ("GP Sullins") take the position that there is "no written agreement" between GP Sullins and GPS and that GPS has no "ownership or other interests in the assets" of GP Sullins.

This position is false.

GPS and GP Sullins have a clear and unequivocal agreement. The salient terms of the agreement (the "**Agreement**") are that (i) GPS would acquire 100 percent of the shares of GP Sullins from its Members and take ownership of its assets, (ii) GPS would, and has, allocated for issue 40% of its common shares pro-rata for the representative interest in '225 Acres', as illustrated in the Business Plan, and (iii) pursuant to the Business Plan, GPS would raise sufficient funds to pay $40 million USD pro-rata for the representative interest in '225 Acres' as illustrated in the Business Plan. Further, and pursuant to the Business Plan, GPS was to provide, and provided, senior executive and mining industry services which resulted in a world class resource.

GPS has performed its obligations under the Agreement: it raised the initial $2 million USD pursuant to the Business Plan; it secured sufficient interest to fund the payment of $40 million USD pursuant to the Agreement, before being obstructed by GP Sullins, and continues to take additional steps to develop the assets of GP Sullins, such as contributing intellectual property and developing palpable interest among global-class professional services providers, such as: SRK Exploration Services (UK); world renown assayers – Anzaplan (Germany); SGS (Switzerland), and ActLabs (Canada); regional drillers 3D Dycus Diamond Drilling, and; venerable professional service providers, namely Deloitte, Cantor Fitzgerald, and Fasken LLP.

Prior to GPS' involvement with GP Sullins, there had been no meaningful work undertaken on the GP Sullins' property for several generations, as GP Sullins did not possess the requisite skills, experience and initiative.

As a result of GP Sullins' conduct, GPS is being prevented from executing on its detailed program to monetize the defined resource.

95 WELLINGTON STREET WEST, SUITE 1830, TORONTO ON M5J 2N7 | T 416 789 9940 F 647 689 2054
AGBLLP.COM

The work that GPS performed pursuant to the Agreement is well documented and includes, without limitation, minutes of over 40 weekly meetings hosted by GPS where the officers and managing members of GP Sullins confirmed the Agreement.

We understand that GP Sullins is attempting to pursue a liquidity event or financing to the exclusion of GPS and contrary to the terms of the Agreement. Worse, we understand that GP Sullins is pursing this liquidity event using and relying on GPS' intellectual property. Doing so would breach the Agreement and subject both GP Sullins and the counterparty to any such transaction to liability.

We are hereby providing notice of GPS' ownership in GP Sullins and its assets. We are further providing notice that there can be no steps taken to encumber, sell or otherwise transact with GP Sullins or its assets without the consent of GPS, including by its sole managing director.

GPS reserves its rights to pursue any and all of its legal and equitable remedies, which may include personal liability for anyone who knowingly interferes with its economic interests and its ownership of GP Sullins and its assets.

We require immediate written confirmation from GP Sullins, that it will not take any steps to dispose of its assets, encumber, impair or otherwise alienate the assets, and will not do so until such time as the shares are transferred from GP Sullins to GPS in accordance with the terms of the Agreement. We ask for a response by August 16, 2023.

Yours truly,

Simon Bieber
SB/al