# THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION
## CIVIL CASE NO. 1:23-cv-00325-MR-WCM

G.P. SULLINS LAND COMPANY, LLC, )
                                      )
                **Plaintiff,**       )
                                        )     <u>**MEMORANDUM OF**</u>
           **vs.**                )     <u>**DECISION AND ORDER**</u>
                                         )
GPS QRTZ CORP. a/k/a GPS          )
QUARTZ CORP., FRANK SALVATI,     )
and BLAIR KRUEGER,               )
                                        )
              **Defendants,**     )
                                         )
and                                       )
                                         )
GPS QRTZ CORP. and SAGEGATE    )
CORPORATION,                   )
                                         )
           **Counterclaim Plaintiffs,**    )
                                         )
           **vs.**               )
                                         )
G.P. SULLINS LAND COMPANY, LLC, )
et al.,                                      )
                                         )
           **Counterclaim Defendants.**   )
_____ )

**THIS MATTER** is before the Court on Plaintiff and Counterclaim Defendant G.P. Sullins Land Company, LLC's Motion to Dismiss Amended Counterclaims [Doc. 100], Alternative Motion for Partial Summary Judgment on Certain Amended Counterclaims [Doc. 101], and Motion for Partial

Summary Judgment on Declaratory Judgment Claim [Doc. 102]; Certain Counterclaim Defendants' Motion to Dismiss First Amended Counterclaims [Doc. 116]; and the Estate of Ralph Alexander Dickson, III's Motion to Dismiss First Amended Counterclaims [Doc. 119].

## I.    PROCEDURAL HISTORY

This litigation arises from a business dispute regarding ownership interest in the Plaintiff, G.P. Sullins Land Company ("Sullins"), which controls approximately 225 acres of highly valuable quartz sand mining property in Mitchell County, North Carolina.  The Counterclaim Plaintiffs GPS Quartz Corp. ("GPS") and Sagegate Corporation ("Sagegate") are corporations that assert a right to ownership of Sullins pursuant to an alleged Acquisition Agreement with the Counterclaim Defendants.  The Counterclaim Defendants, who assert that no such enforceable agreement exists, are Sullins and the forty-nine owners of Sullins: Wenda S. Moore; Gerald G. Sullins; Richard T. Sullins; Janice Dickson Mercer; Laura Poppe, Trustee of the Myra D. Myers Family Trust; Cynthia S. Byrd; Gloria S. Hollifield; Rhonda D. Schleider; Dorothy Anne Bayliss; Robert D. Bayliss; Mary Crawford; Michael Thomas; Constance D. Dodd; Deborah L. Parish; Paige Powell; Ray Richard Taylor; Richard R. Taylor; Robert S. Taylor; John K. Taylor; Phyliss A. Anderson; Brandon  Moss; Martha Bradshaw; Sylvia Greer; Mary B.

2

Joyner; Richard Payne; Daniel Teeter; John Teeter; Kathryn Teeter; Robert Teeter; Daniel Teeter and Robert Teeter, as personal representatives of the Estate of Thomas Teeter; Cynthia L. Shaffer; Michele S. Kriezel; Betty Hall; Arthur Herman Bailey, Jr.; Daniel M. Pyane; Amy B. Gray; Joe Denly; Angela Grogan; Sherri Kimbrow; Benjie Ray; Michael T. Ray; Tiffany Vilar; Carlette W. McCoy; Melanie Paulin; Darryl Sims; Blake Denly; Carl Watts; Ann W. Dickson, Executrix of the Estate of Ralph Alexander Dickson, III; and the Estate of Garret Randolph Moss (collectively, the "Members" of Sullins).

On August 16, 2023, Sullins initiated this action by filing a Complaint in the Superior Court for Mitchell County, North Carolina, asserting a single cause of action for a declaratory judgment regarding various aspects of the contractual relationship between Sullins and GPS, Frank Salvati, and Blair Krueger ("Defendants"). [Doc. 1-3]. On September 5, 2023, Sullins filed an Amended Complaint asserting an additional cause of action under N.C. Gen. Stat. § 78A-1 for violations of the North Carolina Securities Act. [Doc. 1-11]. On November 9, 2023, the Defendants timely filed Notice of Removal to this Court. [Doc. 1]. On January 12, 2024, the Defendants moved to dismiss the Plaintiff's Amended Complaint. [Doc. 16]. On November 5, 2024, the Court denied the Defendants' motion except as to the Sullins's claim for fraud under N.C. Gen. Stat. § 78A-8(1) and (3). [Doc. 28]. The Defendants filed

3

an Answer, with counterclaims asserted by GPS and Sagegate, on December 3, 2024.[1]  [Doc. 30].

On September 5, 2025, GPS and Sagegate filed Amended Counterclaims.  [Doc. 87].  On October 17, 2025, Sullins filed a motion to dismiss all of the counterclaims, as well as an alternative summary judgment motion regarding four of the counterclaims, and a partial summary judgment motion regarding Sullins's declaratory judgment claim.  [Docs. 100, 101, 102].  On November 25, 2025, "Certain Counterclaim Defendants"—namely, all the Members except for the Estates of Ralph Alexander Dickson, III and Garret Randolph Moss—filed a motion to dismiss all the counterclaims against them.[2]  [Doc. 116].  On December 8, 2025, the Estate of Ralph Alexander Dickson, III filed a motion to dismiss all the claims against it.  [Doc. 119].  All four motions regarding the Amended Counterclaims, as well as Sullins's motion regarding its declaratory judgment claim, have been fully briefed.  [Docs. 103, 112, 115, 117, 120, 122, 124, 125, 127].  Accordingly, these motions are ripe for disposition.

---

[1] The Magistrate Judge previously granted joinder of Sagegate as a Counterclaim Plaintiff and the Members of Sullins as Counterclaim Defendants.  [Doc. 35].

[2] On October 14, 2025, the Counterclaim Plaintiffs filed an Affidavit of Service on the Estate of Garret Randolph Moss, but the Estate has not yet made an appearance in this matter.  [Doc. 97].  No motion concerning the Counterclaim Plaintiffs' individual claims against the Estate of Garret Randolph Moss is currently pending before this Court.

4

## II.     STANDARD OF REVIEW

### A.     Motion to Dismiss Standard

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  To be "plausible on its face," a plaintiff must demonstrate "more than a sheer possibility that a defendant has acted unlawfully."  Id.  In reviewing a complaint, the Court must accept the truthfulness of all factual allegations but is not required to assume the truth of "bare legal conclusions."  Aziz v. Alcolac, Inc., 658 F.3d 388, 391 (4th Cir. 2011).  Determining whether a complaint states a plausible claim for relief is "a context-specific task," Iqbal, 556 U.S. at 679, which requires assessing whether the factual allegations of the Complaint are sufficient "to raise a right to relief above the speculative level," Twombly, 550 U.S. at 555.  As the Fourth Circuit has explained:

> To satisfy this standard a plaintiff need not forecast evidence sufficient to prove the elements of the claim.  However, the complaint must allege sufficient facts to establish those elements.  Thus, while a plaintiff does not need to demonstrate in a complaint that the right to relief is probable, the complaint must advance the plaintiff's claim across the line from conceivable to plausible.

Walters, 684 F.3d at 439 (citations and internal quotation marks omitted).

5

## B. Summary Judgment Standard

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Facts are material when they might affect the outcome of the case, and a genuine issue exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." Ballengee v. CBS Broad., Inc., 968 F.3d 344, 349 (4th Cir. 2020) (quoting News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010)). When ruling on a motion for summary judgment, the Court does not "weigh the evidence or make credibility determinations." Jacobs v. N.C. Admin. Off. of the Cts., 780 F.3d 562, 568-69 (4th Cir. 2015). The Court must view the pleadings and materials presented in the "light most favorable" to the nonmovant and must "draw all reasonable inferences" in the nonmovant's favor. Adams v. UNC Wilmington, 640 F.3d 550, 556 (4th Cir. 2011). "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact." Bouchat, 346 F.3d at 522. If this showing is made, the burden then shifts to the nonmoving party, who must convince the Court that a triable issue does exist. Id.

6

## III. FACTUAL BACKGROUND

Taking the well-pled factual allegations in the Amended Counterclaims as true for the purpose of evaluating the Counterclaim Plaintiffs' motion to dismiss, the following is a recitation of the relevant facts.

In the 1890s, Guilford Perry Sullins acquired hundreds of acres of land in North Carolina. [Doc. 87 at ¶ 26]. For over a century, divided interests in that land were passed down through successive generations of Guilford Perry Sullins's descendants. [Id. at ¶ 27]. In 2012, the heirs formed a limited liability company to consolidate their individual property interests. [Id. at ¶ 31]. That consolidation resulted in the forty-nine Members owning interests in Sullins according to their prior respective property interests, and in Sullins owning an undivided interest in approximately 225 acres of undeveloped land (the "Mining Property") in Mitchell County, North Carolina that is believed to contain significant deposits of high purity quartz. [Id. at ¶¶ 11-12, 31-32]. High purity quartz is a rare mineral used in solar panels, semiconductor chips, and microprocessors. [Id. at ¶ 18]. Over 80% of the world's supply of high purity quartz is produced at two properties adjacent to the Mining Property, and the Mining Property is believed to be worth more than $100 million. [Id. at ¶¶ 12, 18, 33-35].

7

In March 2022, Frank Salvati and Blair Krueger, Canadian investors with backgrounds in the mining industry, met with representatives of Sullins to discuss their interest in the mining property and the possibility of purchasing the property or creating a joint venture with Sullins. [Id. at ¶¶ 13-16, 21-22, 24-25, 37-39]. In May 2022, Krueger visited the Mining Property, and in June 2022, Sullins representatives joined Salvati and Krueger at a mineral exploration and mining convention in Canada and met with Salvati and Krueger's global mining contacts. [Id. at ¶¶ 41-43]. At the time, Ralph Dickson, one of Sullins's representatives, told Krueger that the listing price for the outright sale of the Mining Property was $40 million. [Id. at ¶¶ 44-45].

On June 28, 2022, Salvati and Krueger met with Sullins representatives to propose a deal for the Mining Property, and the Sullins representatives invited Salvati and Krueger to a July 2022 meeting in Las Vegas to formally present their proposal. [Id. at ¶¶ 47-48]. The Sullins representatives told Salvati and Krueger that there would be a "quorum" at the Las Vegas meeting and that the meeting attendees would have the authority to enter into an agreement regarding the Mining Property on behalf of Sullins and its Members. [Id. at ¶¶ 49-50].

In late June 2022, Sullins disclosed to Salvati and Krueger the existence of a Right of First Refusal Agreement between Sullins and another

8

potential buyer.  [Id. at ¶ 51].  The officers and managing members of Sullins informed Salvati and Krueger that, in order to avoid triggering the Right of First Refusal Agreement, any deal regarding the Mining Property would have to be structured as an exchange of the Members' interests in Sullins, rather than as a sale of the Mining Property.  [Id. at ¶¶ 52-55].  As a result, Salvati and Krueger proposed a deal structured in accordance with those terms.  [Id. at ¶ 56].  The terms of the proposed deal included: (1) Salvati would create a new corporation ("NewCo") to acquire the Members' interests in Sullins; (2) 40% of the shares of NewCo would be allocated to the Members; (3) NewCo would raise $2 million dollars to fund the initial exploration of the property ("Phase 1"); (4) NewCo would raise $50 million, $40 million of which would be paid to Members ("Phase 2"); (5) NewCo would provide all intellectual property and services needed to develop the Mining Property; and (6) NewCo would eventually become a publicly listed company ("Phase 3").  [Id. at ¶¶ 58-59, 84].  On July 21, 2022, Salvati and Krueger formally proposed the deal and presented their mining and business plans to the Sullins officers and managing Members in attendance at the Las Vegas meeting.  [Id. at ¶¶ 64-65, 67-68].

On July 22, 2022, Dickson announced to Salvati and Krueger that "we are doing the deal!"  [Id. at ¶ 71].  Salvati and Krueger understood Dickson

9

to be speaking on behalf of Sullins and its Members, and none of the Sullins Members present for the announcement indicated otherwise. [Id. at ¶¶ 71-72]. As a result, Salvati and Krueger understood Dickson's announcement to be an acceptance of the offer they had proposed the day prior, thereby contractually binding Sullins and its Members to the terms as proposed (the "Acquisition Agreement"). [Id. at ¶¶ 73]. Dickson further announced that he would personally invest the full $2 million needed for Phase 1 of the business plan, which involved exploratory drilling on the Mining Property. [Id. at ¶ 74]. Dickson and Garret Moss, two of the managing Members of Sullins, as well as Hayden Moss, a representative of Sullins, then proceeded to shake Salvati's hand. [Id. at ¶ 75]. The parties celebrated the deal that evening, and during a meeting the following morning, Sullins President and managing Member Keith Taylor stated that he had "100% support for the deal!" [Id. at ¶¶ 77-79]. The parties never executed a written instrument reflecting the Acquisition Agreement. [Id. at ¶ 88].

According to Salvati and Krueger, the parties thereafter conducted business in accord with the plan discussed at the Las Vegas meeting. On July 26, 2022 Salvati incorporated NewCo as "GPS QRTZ Corp." to reflect the initials of Guilford Perry Sullins, in accord with the written request of Dickson and Garret Moss. [Id. at 89-90]. On August 11, 2022, Salvati,

Krueger, and Dickson, as representative of GPS, met at a bank in Charlotte to advise the bank of the Acquisition Agreement and set up a bank account, which Dickson executed, for GPS. [Id. at ¶¶ 98, 100]. At that time, Dickson held himself out as Chair of GPS, and one of the bank documents noted that Members of Sullins were a "40% shareholder group" of GPS. [Id. at ¶ 100]. On August 13, 2022, Salvati and Krueger attended a family reunion of Sullins Members, where they were introduced as Sullins's "Canadian Partners." [Id. at ¶¶ 104-05]. At the reunion, the Acquisition Agreement was announced, Salvati made a presentation, and no Members questioned or refuted the Acquisition Agreement. [Id. at ¶¶ 105-09]. Starting on August 27, 2022, GPS began holding weekly virtual meetings with Sullins officers to discuss business progress and strategy. [Id. at ¶¶ 132-37]. In late September 2022, Salvati, Krueger, and Dickson met with an investment manager to discuss funding Phase 2 of the business plan. [Id. at ¶¶ 111-12]. On September 29, 2022, at the request of Sullins President Keith Taylor, GPS entered into an oral Management Services Agreement with Sullins in order to facilitate exploratory drilling activity. [Id. at ¶¶ 113-14, 119]. Taylor represented that the agreement was necessary because the state drilling permits were in the name of Sullins, not GPS. [Id. at ¶ 114]. Pursuant to the Management Services Agreement, Sullins began paying GPS $20,000 per month starting

11

in October 2022. [Id. at ¶ 117]. Through the remainder of 2022, GPS continued holding weekly meetings and preparing for exploratory drilling and fundraising for Phase 2 of the business plan. [Id. at ¶¶ 120-24]. GPS also shared confidential information, including a highly detailed Gantt chart,[3] with Sullins Members. [Id. at ¶¶ 125-31].

GPS began exploratory drilling on the Mining Property in December 2022. [Id. at ¶ 138]. The results of the exploratory drilling across several months indicated that the Mining Property would be extremely profitable if managed properly. [Id. at ¶¶ 144-45]. The drill cores produced during this process were initially stored in a shipping container on the Mining Property and then moved to a location in Gastonia, North Carolina that was owned or controlled by Dickson. [Id. at ¶ 146]. During the exploratory drilling process, Dickson told Salvati three times that "we are sticking to the deal." [Id. at ¶ 148].

In March 2023, Salvati, Krueger, and six representatives of Sullins attended a four-day mineral exploration and mining convention in Canada. [Id. at ¶ 162]. On behalf of GPS, Salvati prepared for the convention by facilitating business meetings and preparing an investment presentation and

---

[3] A Gantt chart is a project management tool that visually displays a project's component activities and the schedule for those activities in a manner akin to a bar chart.

12

non-disclosure agreements. [Id. at ¶ 157-59]. Salvati also advanced money from the Management Services Agreement to cover over $40,000 worth of expenses for the attendance of the Sullins representatives. [Id. at ¶ 162]. During the convention, GPS led meetings with potential investors and industry professionals, one of which led to a draft Letter of Engagement with GPS for funding Phase 2. [Id. at ¶ 163].

At the convention, however, Sullins President Taylor began requesting to take part in investor meetings that would have normally been managed solely by Salvati. [Id. at ¶ 177]. In April 2023, Sullins stopped making the monthly $20,000 management services payments to GPS. [Id. at ¶ 180]. On May 27, 2023, Taylor told GPS that Sullins representatives would be meeting with a third-party IPO expert to review the GPS business plan. [Id. at ¶ 177]. On June 8, 2023, Taylor told GPS that Sullins would be entering into an internal due diligence process independent of GPS. [Id.]. In June 2023, Sullins denied Salvati access to certain intellectual property of GPS that had previously been stored on the Mining Property but was moved to a location owned or controlled by Dickson. [Id. at ¶ 183]. These developments concerned Salvati, but he kept facilitating GPS's weekly meetings, and Sullins representatives continued attending. [Id. at ¶¶ 132, 179]. Moreover, during phone calls with Dickson and Hayden Moss on May 10, May 20, and

13

June 8, 2023, Salvati was reassured that Sullins and its Members remained "partners" with GPS.  [Id. at ¶ 178].

On July 7, 2023, Salvati received a letter from Sullins Secretary Treasurer Athos Rostan rejecting payment of GPS's $20,000 invoices for April, May, and June, and denying that Sullins had entered into any agreement with Salvati or Krueger regarding ownership interest in Sullins or the Mining Property.  [Id. at ¶ 184; Doc. 1-3 at 33].  The letter stated that Salvati and Krueger were not agents of Sullins, had no ownership interest in Sullins, and had never been authorized to operate on behalf of Sullins.  [Doc. 1-3 at 33].  On August 11, 2023, counsel for GPS responded to the July 7, 2023 letter and rejected the position taken by Sullins in the letter.  [Doc. 97 at ¶ 187; Doc. 1-3 at 34-37].  Counsel for GPS asked for a response by August 16, 2023, and on that day Sullins filed a state-court Complaint against GPS, Salvati and Krueger that commenced the present litigation.  [Doc. 1-3 at 7, 37].  GPS believes that Sullins has shared intellectual property owned by GPS with third parties in pursuit of a more lucrative deal for Sullins and that Sullins has entered negotiations to sell a strategic 1.8 acre portion of the Mining Property that would substantially diminish the value of the remaining property.  [Id. at ¶¶ 190-91].

14

## IV. DISCUSSION

The Counterclaim Plaintiffs have asserted ten counterclaims against Sullins: (1) breach of the Acquisition Agreement contract; (2) breach of the Management Services Agreement contract; (3) breach of the implied duty of good faith and fair dealing; (4) conversion of GPS's personal property; (5) misappropriation of GPS's trade secrets; (6) unjust enrichment; (7) fraud; (8) negligent misrepresentation; (9) unfair and deceptive trade practices in violation of N.C. Gen. Stat. § 75-1.1; and (10) preliminary injunction to prevent the conveyance of the Mining Property during the pendency of litigation. [Doc. 87 at ¶¶ 193-291]. The first, third, and tenth counterclaims are also asserted against all the Members of Sullins. The fourth counterclaim is also asserted against the Estate of Ralph Dickson. The seventh, eighth, and ninth counterclaims are also asserted against the Estate of Ralph Dickson, the Estate of Garret Moss, and Keith Taylor.

With the exception of the Estate of Garret Moss, which has not made an appearance in this matter, all the Defendants have moved to dismiss all the counterclaims against them. Sullins has also moved, in the alternative, for partial summary judgment as to counterclaims one, three, six, and ten, as well as for partial summary judgment on its declaratory judgment claim.

15

**A. Counterclaims 1, 3, 6, and 10 Against Sullins: Breach of the Acquisition Agreement, Breach of the Implied Duty of Good Faith and Fair Dealing, and Unjust Enrichment**

Sullins contends that the Counterclaim Plaintiffs have judicially admitted that Sullins was not a party to the alleged Acquisition Agreement, and, as a result, that the first, third, sixth, and tenth counterclaims against Sullins should be dismissed. [Doc. 103 at 9-13]. Sullins's partial summary judgment motions are also predicated on this theory regarding the Counterclaim Plaintiffs' judicial admissions. [Doc. 103 at 12]; see also [Docs. 102, 103]. Sullins has not moved to dismiss these counterclaims on any other ground.

"A judicial admission is a representation made by a party that, unless allowed by the court to be withdrawn, is conclusive in the case." Everett v. Pitt Cnty. Bd. of Educ., 788 F.3d 132, 141 (4th Cir. 2015) (internal quotation marks omitted). "[T]he doctrine of judicial admission is largely concerned with matters of fact." Flexi-Van Leasing, Inc. v. Travelers Indem. Co., 837 F. App'x 141, 145 (4th Cir. 2020). However, judicial admissions are not "limited to affirmative statements that a fact exists," as "[t]hey also include intentional and unambiguous waivers that release the opposing party from its burden to prove the facts necessary to establish the waived conclusion of law." Meyer v. Berkshire Life Ins. Co., 372 F.3d 261, 264–65 (4th Cir. 2004). "A purported

16

judicial admission is binding only if the statement is deliberate, clear, and unambiguous." Everett, 788 F.3d at 141 (internal quotation marks omitted). However, a court's determination that a statement is a judicial admission "is not necessarily the final word." Flexi-Van Leasing, 837 F. App'x at 146. "[A] court, unquestionably, has the right to relieve a party of his judicial admission if it appears that the admitted fact is clearly untrue and that the party was laboring under a mistake when he made the admission." Id. (quoting New Amsterdam Cas. Co. v. Waller, 323 F.2d 20, 24 (4th Cir. 1963)).

Ordinarily, questions of judicial admissions pertain to facts that are asserted in pleadings, such as an allegation in a complaint or an admission in an answer. In rare instances, however, statements in other documents, including briefs, can rise to the level of judicial admissions if they affirmatively waive a factual point or position.

Here, the purported judicial admissions were made in the context of the Defendants' argument, in briefing in support of their motion to dismiss, that Sullins lacked standing to bring its declaratory judgment claim against them. In that briefing, the Defendants stated: "Specifically, the Acquisition Agreement was between Defendant GPS QRTZ and the *individual members of Sullins, LLC*, not Plaintiffs." [Doc. 17 at 6 (emphases in original)]. The Defendants made multiple similar statements in both their opening and reply

17

memoranda in support of their motion.  <u>See</u>, [Doc. 17 at 8; Doc. 20 at 2]. Generally, the Defendants' standing argument rested on the theory that the Acquisition Agreement had been structured as an exchange of the ownership interests in Sullins, which were held by the Members, and not as a sale of land, which was held by Sullins.  [Doc. 17 at 6-9; Doc. 20 at 1-4]. However, in their reply memorandum, the Defendants also stated that they had "never 'conceded' nor 'admitted' that there was never any agreement between [Sullins] and Defendants," and they "reserve[d] the right to make any additional arguments as may be appropriate at later stages of the proceedings."  [Doc. 20 at 3 n.1].

The Amended Counterclaims rely on the same theory of the Acquisition Agreement that the Defendants espoused in their earlier briefing—namely, that the Acquisition Agreement was structured as an exchange of the ownership interests in Sullins.  [Doc. 87 at ¶¶ 48-60, 80-88]. However, the Amended Counterclaims differ from the Defendants' earlier briefing insofar as they allege that "the officers and managing Members of Sullins, LLC accepted and assented to the Acquisition Agreement *on behalf of Sullins, LLC* and its Members."  [<u>Id.</u> at ¶ 195 (emphasis added)].  In other words, the Counterclaim Plaintiffs now allege that Sullins was also a party to the Acquisition Agreement.  Sullins, in turn, contends that the Defendants'

prior statements regarding the parties to the Acquisition Agreement were judicial admissions that bind the Counterclaim Plaintiffs and prevent them from asserting that Sullins was a party to the Acquisition Agreement. [Doc. 103 at 9-13].

In other words, the *pleadings* directly refute Sullins's position regarding the purported judicial admission. Sullins presents no support for the position that a prior briefing regarding a discrete issue of standing somehow overrides subsequent pleadings as to the broader issue of Sullins's role in the agreements.

Even though the Defendants' prior statement that Sullins was "<u>not</u>" a party to the Acquisition Agreement was indisputably deliberate, [Doc. 17 at 6 (emphasis in original)], the alleged statements of acceptance of the Acquisition Agreement are ambiguous as to who, if anyone, was bound by such statements. Moreover, the Counterclaim Plaintiffs contend that the Defendants were laboring under Sullins's mischaracterizations of the facts when they made the purported judicial admissions, [Doc. 112 at 10-11], and the Defendants expressly stated that it was not their intent to concede or admit that there was never any agreement between Sullins and the Defendants once Sullins raised the issue, [<u>id.</u> at 12].

Despite the fact that this case is now nearly three years old, it has not yet escaped the pleading stage. The *pleadings* make clear that this issue has not been disposed of by judicial admission. Accordingly, the Court will decline to treat the Defendants' statements as claim-dispositive judicial admissions and will instead reserve the issue regarding whether Sullins was a party to the Acquisition Agreement for a future proceeding on a more developed record. The Court will therefore deny Sullins's motion to dismiss as to the first, third, sixth, and tenth counterclaims, as well as Sullins's motions for partial summary judgment.

**B.** **Counterclaims 1 and 3 Against the Members: Breach of the Acquisition Agreement and Breach of the Implied Duty of Good Faith and Fair Dealing**

The Members have moved to dismiss the counterclaims for breach of contract and breach of the implied duty of good faith and fair dealing on grounds that the Counterclaim Plaintiffs failed to adequately plead that the officers and managing Members of Sullins who allegedly accepted the Acquisition Agreement were the Members' agents and had authority to bind the Members to the agreement. [Doc. 117 at 8-13].

The Amended Counterclaims, however, contain many detailed allegations that, accepted as true, could support a finding of the requisite agency relationship or of ratification of the Acquisition Agreement. For

20

example, the Counterclaim Plaintiffs allege that certain Members assured Salvati and Krueger that the Members at the Las Vegas meeting would constitute a "quorum" and have "authority" to accept the proposed deal at the meeting. [Doc. 87 at ¶¶ 49, 60, 62, 65]. They further allege that various Members dictated the structure of the Acquisition Agreement, accepted and were present for the acceptance of the agreement at the Las Vegas meeting, shook hands regarding the agreement, celebrated the agreement, expressed support for the agreement, attended a family reunion at which the terms of the agreement were presented, and attended over forty meetings during which business was conducted in accord with the terms of the agreement. [Id. at ¶¶ 53-54, 63-66, 71-73, 75-79, 103-08, 132-34, 137, 166-72]. Finally, the Counterclaim Plaintiffs also allege that, for at least ten months after the Las Vegas meeting, no Member of Sullins questioned or refuted the Acquisition Agreement. [Id. at ¶¶ 109, 136].

The Court concludes that these allegations in the Amended Counterclaims are sufficient to "advance the plaintiff's claim across the line from conceivable to plausible." Walters, 684 F.3d at 43. Accordingly, the Court will deny the motions to dismiss as to the first and third counterclaims against the Members.

### C.    Counterclaim 2: Breach of the Management Services Agreement

Sullins has moved to dismiss the counterclaim for breach of the alleged Management Services Agreement on grounds that the Counterclaim Plaintiffs failed to provide nonconclusory allegations in support of the claim. [Doc. 103 at 13-14].   The Amended Counterclaims, however, contain allegations that the agreement was entered into on September 29, 2022 at Sullins's request, that in October 2022 Sullins began paying GPS $20,000 per month pursuant to the agreement, that Sullins stopped making those payments in April 2023, and that business dealings between GPS and Sullins continued in and after April 2023.  [Doc. 87 at ¶¶ 113-19, 132, 165, 180].

The Court concludes that these allegations in the Amended Counterclaims are not merely conclusory and are sufficient to "advance the plaintiff's claim across the line from conceivable to plausible."  Walters, 684 F.3d at 43.  Accordingly, the Court will deny Sullins's motion to dismiss as to the second counterclaim.

### D.    Counterclaim 4: Conversion

"North Carolina law defines conversion as 'an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights.'"  Flexible Foam Prods., Inc. v. Vitafoam Inc.,

22

980 F. Supp. 2d 690, 700 (W.D.N.C. 2013) (quoting <u>Norman v. Nash Johnson & Sons' Farms, Inc.</u>, 140 N.C. App. 390, 414, 537 S.E.2d 248, 264 (2000)).  "There are, in effect, two essential elements of a conversion claim: ownership in the plaintiff and wrongful possession or conversion by the defendant." <u>Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC</u>, 365 N.C. 520, 523, 723 S.E.2d 744, 747 (2012).  However, if the defendant originally received the personal property in question "pursuant to a contract" or otherwise lawfully, then the success of a conversion claim also depends on whether the plaintiff can show that it demanded return of the property and the defendant refused to surrender it.  <u>TSC Rsch., LLC v. Bayer Chemicals Corp.</u>, 552 F. Supp. 2d 534, 542 (M.D.N.C. 2008) (citing <u>Hoch v. Young</u>, 63 N.C. App. 480, 483, 305 S.E.2d 201, 203 (1983)).

Here, the relevant property is the set of "Exploratory Drilling Results,"[4] which includes "drill cores, aerial video footage, drilling schematics, site drawings, 3D geological modeling of the drill cores, and other documents and reports."  [Doc. 87 at ¶ 150].  Sullins and the Estate of Ralph Dickson have moved to dismiss the conversion counterclaim on grounds that GPS

---

[4] The Counterclaim Plaintiffs also assert that Sullins converted a Gantt Chart that Salvati and Krueger shared with Sullins and certain Members.  [Doc. 87 at ¶ 221].  However, because the Amended Counterclaims lack material factual allegations to support a conversion claim based on the Gantt Chart, the Court's analysis focuses on the Exploratory Drilling Results.

failed to allege that it demanded the return of this property. [Doc. 103 at 14]. The Counterclaim Plaintiffs, however, allege that "[i]n or about June 2023, Sullins, LLC, at the direction of Mr. Taylor and Mr. Rostan, and/or Mr. Dickson in his individual capacity, denied Mr. Salvati, as officer and managing director of GPS QRTZ, access to, and wrongfully took possession of, the Exploratory Drilling Results." [Doc. 87 at ¶ 183]. The Court concludes that this allegation of denial of access is just enough "to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.

Accordingly, the Court will deny the motions to dismiss the fourth counterclaim as to the Exploratory Drilling Results.

### E. Counterclaim 5: Misappropriation of Trade Secrets

A trade secret is "business or technical information" that "[d]erives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use" and that is "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." N.C. Gen. Stat. § 66-152(3). To state a claim for misappropriation of a trade secret, a plaintiff must allege that the defendant "(1) kn[ew] or should have known of the trade secret; and (2) [h]as had a specific opportunity to acquire it for disclosure or use or has

acquired, disclosed, or used it without the express or implied consent or authority of the owner." Krawiec v. Manly, 370 N.C. 602, 608–09, 811 S.E.2d 542, 547 (2018) (quoting N.C. Gen. Stat. § 66-155). A plaintiff must also "identify a trade secret with sufficient particularity so as to enable a defendant to delineate that which he is accused of misappropriating and a court to determine whether misappropriation has or is threatened to occur." Id. at 609, 811 S.E.2d at 547–48 (quoting Washburn v. Yadkin Valley Bank & Tr. Co., 190 N.C. App. 315, 326, 660 S.E.2d 577, 585 (2008)).

In addition to identifying the relevant trade secrets, a plaintiff must allege "a method, plan, or other act by which they attempted to maintain the secrecy of the alleged trade secrets." Id. at 612, 811 S.E.2d at 549. An allegation that the "plaintiff shared the information at issue with the [ ] defendants with nothing more than an expectation of confidentiality is insufficient to establish that the information was the 'subject of efforts that [were] reasonable under the circumstances to maintain its secrecy.'" Id. (quoting N.C. Gen. Stat. § 66-152(3)(b)). "The reasonable secrecy requirement is linked to the independent economic value requirement because the information's value lies in the competitive advantage over others that [the plaintiff] enjoys by virtue of its exclusive access to it." Sysco Mach. Corp. v. DCS USA Corp., 143 F.4th 222, 228 (4th Cir. 2025).

25

Here, the trade secrets identified by the Counterclaim Plaintiffs as misappropriated include "the Gantt Chart, budgets, lists, and identities of potential investors and Mining Industry Professionals, the Exploratory Drilling Results, and other confidential documents and reports prepared by or on behalf of GPS QRTZ in furtherance of the Acquisition Agreement." [Doc. 87 at ¶ 232]. Considered in full, however, this list suggests that nearly the entire business relationship between GPS and Sullins was a trade secret. "That is the type of claim so 'sweeping and conclusory' that it is impossible for [Sullins] to know what it has been accused of misappropriating or for the court to assess whether [the Counterclaim Plaintiffs] ha[ve] met the reasonable secrecy and independent economic value requirements." Sysco, 143 F.4th at 229 (quoting Krawiec, 370 N.C. at 610, 811 S.E.2d at 542). That type of claim "is also unlikely to be true in practice, which means that it falls short of 'plausible on its face.'" Id. (quoting Iqbal, 556 U.S. at 678). Regarding the two items on which the Counterclaim Plaintiffs focus in their briefing—the Gantt Chart and the Exploratory Drilling Results—the Counterclaim Plaintiffs have not attempted to delineate the components of either item that satisfy the definition of a trade secret from those that do not.

Moreover, the Amended Counterclaims fail to adequately allege that the Counterclaim Plaintiffs made reasonable efforts to maintain the secrecy

of the alleged trade secrets.  As in <u>Krawiec</u>, the Counterclaim Plaintiffs allege merely that they "acted under the reasonable assumption that Sullins, LLC and its managing Members would protect the secrecy of the Trade Secrets." [<u>Id.</u> at ¶ 235].  The Counterclaim Plaintiffs do not, however, allege that they in fact told Sullins and its representatives which materials, if any, they were expected to keep confidential.

Accordingly, the Court concludes that the Counterclaim Plaintiffs have failed to state a plausible claim for misappropriation of trade secrets and will grant Sullins's motion to dismiss as to that claim.

F.    **Counterclaims 7-9: Fraud, Negligent Misrepresentation and Unfair and Deceptive Trade Practices**

The Counterclaim Plaintiffs assert their counterclaims for fraud, negligent misrepresentation, and unfair and deceptive trade practices in the alternative to their claim for breach of the Acquisition Agreement, in the event that the Court concludes that the Acquisition Agreement was not an enforceable contract.  [Doc. 87 at ¶¶ 255, 268, 274].

To state a plausible claim for fraud, a plaintiff must allege: "(1) representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party."  <u>Value Health Sols., Inc. v. Pharm. Rsch. Assocs., Inc.</u>, 385 N.C. 250, 264, 891 S.E.2d 100, 112 (2023).

27

Here, the relevant Counterclaim Defendants have moved to dismiss the fraud counterclaim on grounds that the statements alleged as predicates for the claim are nothing more than broken promises. [Doc. 103 at 20; Doc. 115 at 11; Doc. 117 at 13; Doc. 120 at 7-9; Doc. 125 at 6]. The alleged predicates for the fraud counterclaim, however, include representations by certain Members regarding their authority to bind the other Members to the Acquisition Agreement. [Doc. 87 at ¶ 253]. One Counterclaim Defendant, the Estate of Ralph Dickson, concedes that such representations regarding agency and authority could support a fraud counterclaim but contends that the Counterclaim Plaintiffs nevertheless failed to adequately allege that they conducted a reasonable inquiry into that representation before relying on it. [Doc. 127 at 10-11]. The Amended Counterclaims, however, allege that the representations regarding agency and authority were made by multiple Members, and that the representations were consistent with the deal structure that had purportedly been reviewed and approved by Sullins's attorneys. [Doc. 87 at ¶¶ 47-62, 253-55].

"The tort of negligent misrepresentation occurs when a party justifiably relies to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care." Rountree v. Chowan Cnty., 252 N.C. App. 155, 158, 796 S.E.2d 827, 830 (2017). Here, the relevant

Counterclaim Defendants have moved to dismiss the negligent misrepresentation counterclaim principally on grounds that the Counterclaim Plaintiffs have failed to allege a relevant duty of care.  [Doc. 103 at 22; Doc. 115 at 11-12; Doc. 117 at 15; Doc. 120 at 13-14; Doc. 125 at 7].  North Carolina courts have recognized that such a duty may arise in the context of a transaction in which one party has a monetary interests and "supplies false information for the guidance of others in their business transactions." Rountree, 252 N.C. App. at 160, 796 S.E.2d at 831.  While such a duty "commonly arises within professional relationships," such as those undertaken by real estate appraisers, engineers, and architects, such a duty may also "arise between adversaries in a commercial transaction" when one party to the transaction controls certain information on which the other party to the transaction relies in proceeding with the transaction.  Id. at 160-61, 796 S.E.2d at 831-32.  While the Amended Counterclaims lack material factual allegations regarding the extent to which the Counterclaim Plaintiffs inquired into the accuracy of the alleged negligent misrepresentations regarding agency and authority before the Las Vegas meeting, they do contain allegations regarding interactions with various Members before and after that meeting that assured the Counterclaim Plaintiffs of their reliance on the relevant representations, including some interactions in which the

Counterclaim Plaintiffs sought assurance about the status of the deal. [Doc. 87 at ¶¶ 79, 102-09, 132-36, 166-72].

Accordingly, the Court concludes that the Counterclaim Plaintiffs have advanced their fraud and negligent misrepresentation counterclaims "across the line from conceivable to plausible," and the motions to dismiss those counterclaims will be denied. Walters, 684 F.3d at 439. Moreover, because the fraud and negligent misrepresentation counterclaims supply an adequate predicate for an unfair and deceptive trade practices claim, the motions to dismiss that counterclaim will also be denied. See CPI Sec. Sys., Inc. v. Vivint Smart Home, Inc., 145 F.4th 390, 401 (4th Cir. 2025).

### G. Counterclaim 10: Preliminary Injunction

The Counterclaim Plaintiffs' tenth counterclaim is styled as a claim for a preliminary injunction. However, a preliminary injunction is not a cause of action, and the Counterclaim Plaintiffs have never separately moved for a preliminary injunction. Accordingly, the Court will dismiss the tenth counterclaim as a nullity.

### H. Estate of Garret Randolph Moss

Finally, while the Estate of Garret Randolph Moss appears to have been served by the Counterclaim Plaintiffs, [Doc. 97], the Estate has not yet made an appearance in this matter. The Court will direct the Counterclaim

30

Plaintiffs to take appropriate action against this Counterclaim Defendant within fourteen days of the entry of this Order. If no such action is taken within that period, the Court will dismiss the Counterclaim Defendant Estate of Garret Randolph Moss from the case.

## V. CONCLUSION

Although originally filed in August 2023, this matter has languished in the early stages of litigation. While the crux of the parties' dispute concerns the existence and enforceability of a contract, discovery has not yet begun, and key witnesses to the material factual allegations are now deceased. The Court will dismiss the Counterclaim Plaintiffs' misappropriation of trade secrets and preliminary injunction claims, but the Counterclaim Defendants' motions to dismiss and for summary judgment will otherwise be denied. Accordingly, the Court directs the parties henceforth to timely prosecute their cases and develop the evidentiary record.

### O R D E R

**IT IS, THEREFORE, ORDERED** that Plaintiff and Counterclaim Defendant G.P. Sullins Land Company, LLC's Motion to Dismiss Amended Counterclaims [Doc. 100] is hereby **GRANTED IN PART** and **DENIED IN PART**. The motion is **GRANTED** as to the Counterclaim Plaintiffs' fifth

counterclaim (misappropriation of trade secrets). The motion is otherwise **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff and Counterclaim Defendant G.P. Sullins Land Company, LLC's Alternative Motion for Partial Summary Judgment on Certain Amended Counterclaims [Doc. 101] is hereby **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff and Counterclaim Defendant G.P. Sullins Land Company, LLC's Motion for Partial Summary Judgment on Declaratory Judgment Claim [Doc. 102] is hereby **DENIED**.

**IT IS FURTHER ORDERED** that Certain Counterclaim Defendants' Motion to Dismiss First Amended Counterclaims [Doc. 116] is hereby **DENIED**.

**IT IS FURTHER ORDERED** that the Estate of Ralph Alexander Dickson, III's Motion to Dismiss First Amended Counterclaims [Doc. 119] is hereby **DENIED**.

**IT IS FURTHER ORDERED** that the tenth cause of action in the Amended Counterclaims [Doc. 87] is hereby **DISMISSED**.

**IT IS FURTHER ORDERED** that the Counterclaim Plaintiffs are hereby **DIRECTED** to take appropriate action against the Counterclaim Defendant Estate of Garret Randolph Moss within **fourteen (14) days** of the entry of this Order.

32

**IT IS SO ORDERED.**

Signed: June 9, 2026

Martin Reidinger
Chief United States District Judge

33